## UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF NEW YORK

| | |
|---|---|
| Jhon Peter HYPPOLITE,<br><br>    *Petitioner,*<br><br>     v.<br><br>DONALD J. TRUMP, in his official capacity as President of the United States; PAMELA BONDI, Attorney General of the United States, in her official capacity; KRISTI NOEM, Secretary of the U.S. Department of Homeland Security, in her official capacity; U.S. DEPARTMENT OF HOMELAND SECURITY; TODD LYONS, Acting Director of the U.S. Immigration and Customs Enforcement, in his official capacity; U.S. IMMIGRATION AND CUSTOMS ENFORCEMENT; MARCO RUBIO, Secretary of State, in his official capacity; U.S. DEPARTMENT OF STATE; RUSSELL HOTT, Acting Director of New York Field Office for U.S. Immigration and Customs Enforcement, in his official capacity; SIRCE E. OWEN, Acting Director of the Executive Office for Immigration Review, in her official capacity; RAUL MALDONADO, JR., Warden of Metropolitan Detention Center, in his official capacity;<br><br>    *Respondents.* | Civil Action No. 1:25-cv-04304-NRM<br><br>**REPLY IN SUPPORT OF PETITION FOR WRIT OF HABEAS CORPUS** |

## PETITIONER'S REPLY IN SUPPORT OF PETITION FOR WRIT OF HABEAS CORPUS

# TABLE OF CONTENTS

INTRODUCTION ................................................................................................... 1

FACTUAL AND PROCEDURAL BACKGROUND ............................................. 2

STATUTORY AND REGULATORY BACKGROUND....................................... 6

ARGUMENT ......................................................................................................... 8

  I.    SECTION 1225 IS NOT A LEGAL BASIS FOR MR. HYPPOLITE'S
      DETENTION ................................................................................................8

  II.   MR. HYPPOLITE'S DETENTION VIOLATES HIS CONSTITUTIONAL
      RIGHT TO DUE PROCESS ......................................................................12

      A.  The Court should reject Respondents' breathtaking argument that Mr.
          Hyppolite has no constitutional due process rights. ............................. 12

      B.  Respondents have flagrantly violated Mr. Hyppolite's right to procedural
          due process. ........................................................................................... 15

          1.  Respondents flagrantly ignored their duty to provide notice and
             committed numerous errors in detaining Mr. Hyppolite. .................. 15

          2.  The *Mathews* test demonstrates Respondents' process violations. ........ 16

             i.   Mr. Hyppolite's liberty interest weighs heavily in his favor. ................. 17

             ii.  As Respondents' errors and confusion shows, Mr. Hyppolite faces
                  an elevated risk of erroneous deprivation. ................................... 18

             iii. The government has no interest that outweighs the first two factors..... 20

      C.  Mr. Hyppolite's continued detention deprives him of liberty in violation of
          substantive due process. ........................................................................ 21

  III.  RESPONDENTS HAVE VIOLATED THE APA .....................................25

  IV.  THE EQUITABLE AND HUMANITARIAN CONSIDERATIONS WEIGH
       IN FAVOR OF MR. HYPPOLITE'S RELEASE ......................................26

# TABLE OF AUTHORITIES

**Cases**

*A.L. v. Oddo*,
  761 F. Supp. 3d 822 (W.D. Pa. 2025) .................................................................. 14

*Arechiga v. Archambeault*,
  No. 2:25-cv-600 (CDS) (VCF), 2023 WL 5207589 (D. Nev. Aug. 11, 2023) ..................... 14

*Augustin v. Sava*,
  735 F.2d 32 (2d Cir. 1984) ............................................................................ 9

*Beltran Barrera v. Tindall*,
  No. 3:25-cv-541 (RGJ), 2025 WL 2690565 (W.D. Ken. Sept. 19, 2025) ........................ 11

*Bermudez Paiz v. Decker*,
  No. 18-cv-4759 (GHW) (BCM), 2018 WL 6928794 (S.D.N.Y. Dec. 27, 2018)........... 13, 14

*Black v. Decker*,
  103 F.4th 133 (2d Cir. 2024) ................................................................... passim

*Ceesay v. Kurzdorfer*,
  781 F. Supp. 3d 137 (W.D.N.Y. 2025) ................................................................ 23

*Citizens to Preserve Overton Park, Inc. v. Volpe*,
  401 U.S. 402(1971) .................................................................................... 26

*Cleveland Bd. of Educ. v. Loudermill*,
  470 U.S. 532(1985) .................................................................................... 15

*DHS v. Regents of the Univ. of Cal.*,
  591 U.S. 1(2020) ....................................................................................... 15

*DHS v. Thuraissigiam*,
  591 U.S. 103 (2020) .................................................................................... 12

*Doe v. Noem*,
  778 F.Supp. 3d 311 (D. Mass. 2025).................................................................. 25

*Faure v. Decker*,
  No. 15-cv-5128, 2015 WL 6143801 (S.D.N.Y. Oct. 19, 2015) .................................... 22

*Foucha v. Louisiana*,
  504 U.S. 71(1992) ...................................................................................... 21

*Garcia Barrera v. Andrews*,
  No. 1:25-cv-1006 (JLT) (SAB), 2025 WL 2420068 (E.D. Cal. Aug. 21, 2025) ................... 2

*Gayle v. Johnson*,
  81 F. Supp. 371 (D.N.J. 2015)......................................................................... 15

*Gomes v. Hyde*,
  No. 1:25-cv-11571-JEK, 2025 WL 1869299 (D. Mass. July 7, 2025) ......................... 8, 10

*Hechavarria v. Whitaker*,
    358 F. Supp. 3d 227 (W.D.N.Y. 2019) ........................................................ 18

*INS v. St. Cyr*,
    533 U.S. 289 (2001) ...................................................................................... 25

*Jackson v. Indiana*,
    406 U.S. 715(1972) ....................................................................................... 23

*Leke v. Hott*,
    521 F. Supp. 3d 597 (E.D. Va. 2021) ........................................................... 14

*Leon Espinoza v. Kaiser*,
    No. 1:25-cv-1101 (JLT) (SKO), 2025 WL 2675785 (E.D. Cal. Sept. 18, 2025) ................. 20

*Loper Bright Enters. v. Raimondo*,
    603 U.S. 369(2024) ....................................................................................... 11

*Lopez Benitez v. Francis*,
    No. 25-cv-5937 (DEH), 2025 WL 2371588 (S.D.N.Y. Aug. 13, 2025) ....................... passim

*Lopez v. Sessions*,
    No. 18-cv-4189 (RWS), 2018 WL 2932726 (S.D.N.Y. June 12, 2018) ............................ 20

*Lora v. Shanahan*,
    804 F.3d 601 (2d Cir. 2015) .......................................................................... 19

*Maldonado Vazquez v. Feeley*,
    2025 WL 2676082 (D. Nev. Sept. 17, 2025) ................................................... 11

*Martinez v. Hyde*,
    No. 25-111613-BEM, 2025 WL 2084238 (D. Mass. July 24, 2025) ................. 8, 10

*Martinez v. McAleenan*,
    385 F. Supp. 3d 349 (S.D.N.Y. 2019) ..................................................... 16, 20

*Marx v. Gen. Revenue Corp.*,
    568 U.S. 371 (2013) ...................................................................................... 10

*Mata Velasquez v. Kurzdorfer*,
    No. 25-cv-00493 (LJV), 2025 WL 1953796 (W.D.N.Y. July 16, 2025) ...................... passim

*Mathews v. Eldridge*,
    424 U.S. 319 (1976) ...................................................................................... 16

*Matter of Q. Li*,
    29 I. & N. Dec. 66 (BIA 2025) ................................................................. 11, 12

*Matter of Yajure Hurtado*,
    29 I. & N. Dec. 216 (BIA 2025) .................................................................... 11

*Mercado v. Noem*,
    No. 25-cv-6568 (LAK), 2025 WL 2658779 (S.D.N.Y. Sept. 17, 2025) ......................... 19

*Motor Vehicle Mfrs. Ass'n of the United States, Inc. v. State Farm Mut. Automobile Ins. Co.*,
    463 U.S. 29 (1983) ........................................................................................ 26

*Mullane v. Cent. Hanover Bank & Trust Co.*,
    339 U.S. 306(1950) ................................................................................................. 15

*Munoz Materano v. Artera*,
    No. 25-cv-6137 (ER), 2025 WL 2630826 (S.D.N.Y. Sept. 12, 2025) .......................... passim

*Nat'l TPS Alliance v. Noem*,
    No. 25-cv-1766 (EMC), 2025 WL 2578045 (N.D. Cal. Sept. 5, 2025) ......................... 6, 23

*Orellana v. Francis*,
    No. 25-cv-4212 (OEM), 2025 WL 2402780 (E.D.N.Y. Aug. 19, 2025) ........................... 25

*Pablo Sequen v. Kaiser*,
    No. 25-cv-6487 (PCP), 2025 WL 2650637 (N.D. Cal. Sept. 16, 2025)............................... 2

*Pierre v. Doll*,
    350 F. Supp. 3d 327 (M.D. Pa. 2018) ............................................................................... 14

*R.D.T.M. v. Wofford*,
    No. 1:25-cv-1141 (KES) (SKO), 2025 WL 2686866 (E.D. Cal. Sept. 18, 2025).................. 2

*Reno v. Flores*,
    507 U.S. 292 (1993) ........................................................................................................ 12

*Salad v. Dep't of Corr.*,
    769 F. Supp. 3d 913 (D. Alaska 2025) ............................................................................. 23

*Salcedo Aceros v. Kaiser*,
    No. 25-cv-06924 (EMC), 2025 WL 2637503 (N.D. Cal. Sept. 12, 2025) ......................... 11

*Sampiao v. Hyde*,
    No. 1:25-cv-11981 (JEK), 2025 WL 2607924 (D. Mass. Sept. 9, 2025)............................ 11

*Saravia v. Sessions*,
    280 F. Supp. 3d 1168 (N.D. Cal. 2017)............................................................................ 22

*Schall v. Martin*,
    467 U.S. 253 (1984) ........................................................................................................ 22

*Shaughnessy v. United States ex rel. Mezei*,
    345 U.S. 206 (1953) ................................................................................................. 12, 13

*St. John v. McElroy*,
    917 F. Supp. 243 (S.D.N.Y. 1996) .................................................................................. 18

*U.S. ex rel. Paktorovics v. Murff*,
    260 F.2d 610 (2d Cir. 1958) ............................................................................................ 13

*U.S. v. Salerno*,
    481 U.S. 739, 755 (1987) ................................................................................................ 21

*Valdez v. Joyce*,
    No. 25-cv-4627, 2025 WL 1707737 (S.D.N.Y. June 18, 2025)........................................ 14

*Velasco Lopez v. Decker*,
    978 F.3d 842 (2d Cir. 2020) ............................................................................... 2, 9, 17, 22

*Vera Punin v. Garland*,
   108 F.4th 114 (2d Cir. 2024) ................................................................................. 15

*You v. Nielsen*, 3
   21 F. Supp. 3d 451, 465 (S.D.N.Y. 2018) ............................................................ 24

*Y-Z-L-H v. Bostock*,
   No. 3:25-cv-965 (SI), 2025 WL 1898025 (D. Or. July 9, 2025) ........................... 25

*Zadvydas v. Davis*,
   533 U.S. 678 (2001) ....................................................................................... 21, 24

**Statutes**

28 U.S.C. § 2241 ...................................................................................................... 25

5 U.S.C. § 704 .......................................................................................................... 25

8  U.S.C. § 1229a ....................................................................................................... 6

8 U.S.C § 1101(a)(13) ................................................................................................ 7

8 U.S.C § 1226(a) .................................................................................................. 5, 6

8 U.S.C. § 1182(a)(2)(A)(i) ........................................................................................ 4

8 U.S.C. § 1182(a)(7)(A)(i)(I) .............................................................................. 2, 4, 6

8 U.S.C. § 1182(d)(5)(A) ......................................................................................... 18

8 U.S.C. § 1225(a) ..................................................................................................... 6

8 U.S.C. § 1225(b)(1) ............................................................................................. 6, 7

8 U.S.C. § 1225(b)(2) ...................................................................................... passim

8 U.S.C. § 1226(a) ............................................................................................... 5, 18

8 U.S.C. § 1226(c) ........................................................................................... 6, 8, 10

8 U.S.C. § 1229a ....................................................................................................... 8

8 U.S.C. § 1231 ......................................................................................................... 6

8 U.S.C. §§ 1254a ................................................................................................ 6, 23

8 U.S.C § 1255 ........................................................................................................ 24

Laken Riley Act, PL 119-1, 139 Stat. 3 (Jan. 29, 2025) ......................................... 10

**Regulations**

§ 1003.18(a) ............................................................................................................... 3

8 C.F.R § 1003.12, *et seq* ........................................................................................ 9

8 C.F.R. § 1003.19(h)(2)(i)(B) .................................................................................. 18

8 C.F.R. § 1003.26(c) ................................................................................................. 3

8 C.F.R. § 208.7(a) ..................................................................................................... 6

8 C.F.R. § 235.3(b) ................................................................................................ 7

8 C.F.R. § 236.1(c)(8) ............................................................................................ 8

8 C.F.R. § 245.2(a)(1) .......................................................................................... 24

8 C.F.R. §§ 1003.19(a) .......................................................................................... 8

**Other Authorities**

Alternatives to Detention, ICE https://www.ice.gov/features/atd, last updated Feb. 27, 2025 .... 21

American Immigration Law Association, ICE Memo: Interim Guidance Regarding Detention Authority for Applications for Admission, AILA Doc. No. 25071607 (July 8, 2025), *available at https://www.aila.org/library/ice-memo-interim-guidance-regarding-detention-authority-for-applications-for-admission* ................................................................................. 1

Katie Rose, et al., *Lockdowns, Violence, and "Barbaric Conditions" in a Federal Jail Known for its Famous Detainees*, The Appeal (June 30, 2025), https://theappeal.org/brooklyn-metropolitan-detention-center-solitary-watch/ ....................................................... 17

Press Release, Rep. Dan Goldman, *ICE and Bureau of Prisons Deny Reps. Goldman, Espaillat and Velazquez Access to MDC Brooklyn Amid Reports of Inhumane Conditions* (Aug. 6, 2025), https://goldman.house.gov/media/press-releases/ice-and-bureau-prisons-deny-reps-goldman-espaillat-and-velazquez-access-mdc.................................................... 17

## INTRODUCTION

Petitioner Jhon Peter Hyppolite ("Petitioner" or "Mr. Hyppolite") has been subject to immigration detention in jail-like conditions, in the custody of Respondents, for over two months. There is no reason for him to be detained. Respondents granted Mr. Hyppolite parole at the United States border and released him into the country, where he reunited with his U.S. citizen father and other family members and deepened his connections here. He complied with all of Respondents demands of him, attended all his immigration hearings and sought immigration relief through applications for Temporary Protected Status ("TPS"), asylum, and a family-based immigration visa through his father.

Nonetheless, Respondents upended the life he was building when they detained him without notice after an Immigration Court hearing on July 8, 2025. Although Respondents produced documentation shortly after that time that indicated their belief that Mr. Hyppolite was being detained under their § 1226 discretionary authority, they have—in the midst of litigation—shifted to justifying his detention under their mandatory authority pursuant to 8 U.S.C. § 1225(b)(2)(A)(i). That shift occurred alongside a dramatic nationwide expansion of immigrant detention, in accordance with a policy change effected by Respondents earlier this summer—a change that has been roundly criticized and rejected by courts around the country.[1]

Mr. Hyppolite's detention is not supported by statute, governing case law, or decades of practice, and is plainly unconstitutional. His confinement is not justified by danger or flight risk, the narrow purposes for constitutionally permissible civil immigration detention, and it flagrantly violates his right to procedural due process. It is furthermore arbitrary and capricious, in

---

[1] *See* American Immigration Law Association, ICE Memo: Interim Guidance Regarding Detention Authority for Applications for Admission, AILA Doc. No. 25071607 (July 8, 2025), *available at https://www.aila.org/library/ice-memo-interim-guidance-regarding-detention-authority-for-applications-for-admission*.

violation of the Administrative Procedure Act ("APA"). The Court should grant Mr. Hyppolite a writ of habeas corpus, ordering his immediate release and enjoin Respondents from re-detaining him during the pendency of his immigration proceedings without a pre-deprivation hearing at which the government bears the burden to justify his re-detention by clear and convincing evidence.[2]

## FACTUAL AND PROCEDURAL BACKGROUND

Mr. Jhon Peter Hyppolite entered the United States via the CBP One app on or around December 19, 2022. Declaration of Jhon Peter Hyppolite (hereinafter, "Hyppolite Decl.") at ¶ 22. He encountered Respondents at the U.S.-Mexico border, where Respondents paroled him into the United States and personally issued and served him with an I-94, Arrival/Departure Record, valid until December 18, 2023, and a Notice to Appear ("NTA"). *Id.* At the border, Mr. Hyppolite's picture and fingerprints were taken; he was released without conditions and was not required to regularly check in with Respondents. *Id.* at 23. On or about January 15, 2023, Respondents reissued Mr. Hyppolite an updated NTA which charged him with removability under 8 U.S.C. § 1182(a)(7)(A)(i)(I),[3] and required him to appear before an Immigration Judge ("IJ") at 201 Varick Street, 5th Floor, Room 507, New York, NY on March 19, 2024. Ex. 1,

---

[2] *See, e.g.*, *R.D.T.M. v. Wofford*, No. 1:25-cv-1141 (KES) (SKO), 2025 WL 2686866, at *8 (E.D. Cal. Sept. 18, 2025) (enjoining ICE from re-detaining petitioner without a pre-deprivation hearing before a neutral decisionmaker where the government must show that the petitioner is a danger or flight risk by clear and convincing evidence); *Pablo Sequen v. Kaiser*, No. 25-cv-6487 (PCP), 2025 WL 2650637, at *10 (N.D. Cal. Sept. 16, 2025) (same); *Garcia Barrera v. Andrews*, No. 1:25-cv-1006 (JLT) (SAB), 2025 WL 2420068, at *13 (E.D. Cal. Aug. 21, 2025); *see also Mata Velasquez v. Kurzdorfer*, No. 25-cv-00493 (LJV), 2025 WL 1953796, at *18 (W.D.N.Y. July 16, 2025) (enjoining re-detention "without leave of this Court."). The clear and convincing standard should apply to any hearing ordered by the Court. *See, e.g.*, *Velasco Lopez v. Decker*, 978 F.3d 842, 855-57 (2d Cir. 2020) (applying clear and convincing standard to a bond hearing pursuant to 8 U.S.C. § 1226(a)); *Black v. Decker*, 103 F.4th 133, 155-58 (2d Cir. 2024) (same for bond hearing pursuant to 8 U.S.C. § 1226(c)).

[3] Any noncitizen at the time of application for admission "who is not in possession of a valid unexpired visa, reentry permit, border crossing identification card, or other valid entry document[,] and a valid unexpired passport, [] is inadmissible." 8 U.S.C. § 1182(a)(7)(A)(i)(I).

Notice to Appear. Upon entry, Mr. Hyppolite reunited with his U.S. citizen father, with whom he's resided since being in the United States. Hyppolite Decl. at ¶ 33.

Once in New York City, where his removal proceedings were commenced, Mr. Hyppolite attended every scheduled appearance in those proceedings without exception. *Id*. at ¶ 23. He filed a timely asylum application, without the assistance of counsel, in November 2024. *Id*. at ¶ 26. The asylum application was rejected by Respondents. *Id*. Mr. Hyppolite made a second attempt at refiling his asylum petition in April 2025, again without the assistance of counsel, and that application was also rejected by Respondents. *Id*.

A few days before July 8, 2025, Mr. Hyppolite happened to check EOIR's Automated Case Information System ("ACIS"), as he routinely did, only to notice that he had a scheduled court appearance in his removal proceedings on July 8, 2025. *Id*. at ¶ 31. Mr. Hyppolite never received formal notice of the scheduled hearing. *Id*. Still and all, wanting to remain in compliance with what Respondents expect of him, Mr. Hyppolite voluntarily appeared at the 201 Varick Street immigration court on July 8, 2025.[4] *Id*. At the hearing, the IJ adjourned Mr. Hyppolite's case to February 3, 2026. *Id*. at ¶ 4. Mr. Hyppolite justifiably assumed that the next time he would have to appear in his immigration case would be in February 2026; however, he quickly learned that was not the case. As soon as he stepped out of the courtroom, Mr. Hyppolite was detained by Respondents, placed in hand and ankle cuffs and taken to 26 Federal Plaza, where he remained detained with minimal access to food, limited access to bathroom and shower

---

[4] But for his diligence in checking the docket, he may have been ordered removed in absentia despite his eligibility for immigration relief. *See* 8 C.F.R. § 1003.26(c) (authorizing in absentia removal orders where the Immigration Judge finds that the [noncitizen] is removable and that written notice of the hearing and consequences of failure to appear was properly provided); *id*. § 1003.18(a) ("The Immigration Court shall be responsible for scheduling cases and providing notice to the government and the alien of the time, place, and date of hearings.").

facilities, and was forced to sleep on the floor with no linens.[5] *Id*. at ¶¶ 5, 7. Mr. Hyppolite was never given notice that he would be detained and despite the many times he asked on July 8, 2025 and the days that followed, he was never told why he was being detained. *Id.* Mr. Hyppolite remained at 26 Federal Plaza for 6 days;[6] thereafter, he was transferred to Metropolitan Detention Center ("MDC") in Brooklyn, where he remains in custody to date. *Id*. at ¶ 7.

Upon information and belief, at some point after Respondents detained Mr. Hyppolite, they served him with an I-213, Record of Deportable/Inadmissible Alien, signed by Deportation Officer ("DO") Corrica. *See* Ex. 2, I-213, Record of Deportable/Inadmissible Alien. The I-213 recites Mr. Hyppolite's immigration encounter at the border in a manner inconsistent with Respondents' earlier records. *Id*. Under "IMMIGRATION HISTORY," DO Corrica states that Mr. Hyppolite "unlawfully entered the United States from Mexico at a time and place other than as designated by the United States Attorney General" and that he was "processed for a Notice to Appear [and] Released as per section 212(a)(2)(A)(i) of the Immigration and Nationality Act [8 U.S.C. § 1182(a)(2)(A)(i)].[7]" *Id*. at 2. In fact, Mr. Hyppolite entered the United States via a port of entry and, according to Respondents' records, was charged as inadmissible under 8 U.S.C. § 1182(a)(7)(A)(i)(I).[8] *See, e.g.*, Ex. 1; Hyppolite Decl. ¶ 22. The I-213 also states that, when he entered the country, Mr. Hyppolite "was served with Forms I-200 [Warrant for Arrest of Alien],

---

[5] On the day Mr. Hyppolite was detained, his U.S. citizen father, who was at the hearing with him for support was also detained by Respondents. Mr. Hyppolite's father was released once his immigration status was confirmed. Hyppolite Decl. at ¶ 6.

[6] On the day before he was transferred from 26 Federal Plaza to MDC, Respondents asked Mr. Hyppolite if he wished to voluntarily depart to Haiti; he refused. Hyppolite Decl. at ¶ 8.

[7] "[A]ny alien convicted of, or who admits having committed, or who admits committing acts which constitute the essential elements of (I) a crime involving moral turpitude [] or an attempt to or conspiracy to commit such a crime; or (II) a violation of [] any law or regulation of a State, the United States, or a foreign country[] is inadmissible." INA § 212(a)(2(A)(i), 8 U.S.C. § 1182(a)(2)(A)(i).

[8] "[A]ny immigrant at the time of application for admission [] who is not in possession of a valid unexpired immigrant visa, reentry permit, border identification card, or [] a valid unexpired passport [] is inadmissible." 8 U.S.C. § 1182(a)(7)(A)(i)(I).

I-862 [Notice to Appear], I-286 [Notice of Custody Determination], [and] I-220A [Order of Release on Recognizance]." Ex. 2 at 2-3.[9] Respondents also issued Mr. Hyppolite a Form I-286, Notice of Custody Determination —which is signed by a deportation officer and which Respondents have submitted to the Court—stating that Mr. Hyppolite will be detained "[p]ursuant to the authority contained in [8 U.S.C. § 1226] and part 236 of title 8, Code of Federal Regulations." Ex. 3, Notice of Custody Determination. Section 1226 generally provides for custody review before a neutral immigration judge. *See* 8 U.S.C § 1226(a). In Mr. Hyppolite's case, the notice states that he "may request a review of this custody determination by an immigration judge," and Mr. Hyppolite did in fact check and sign the box stating, **"I do request immigration judge review of this custody determination."** *Id*.

Following his detention July 8, 2025, Mr. Hyppolite was able to retain counsel in his immigration proceedings. Attorney Keiana James of The Bronx Defenders was assigned to his case as part of the New York Family Immigrant Unity Project ("NYFIUP"). *Id*. at ¶ 27. With the help of Ms. James, Mr. Hyppolite resubmitted his asylum petition for the third time in September 2025, it was accepted by the immigration court and remains pending to this day.[10] *Id*. at ¶ 28.

On August 6, 2025, Mr. Hyppolite's father, ███████████, filed a *pro se* petition in this instant matter, as a next of friend, challenging Mr. Hyppolite's detention and seeking a writ of habeas corpus. ECF. No. 1, *Pro Se* Pet. Also in August 2025, Mr. Hyppolite's father filed a Form I-130, Petition for Alien Relative, on his behalf; that application remains pending as of this filing. Hyppolite Decl. at ¶ 30. Mr. Hyppolite applied for Temporary Protected

---

[9] These documents—with the exception of the Notice to Appear—would only be given to Mr. Hyppolite if he were being released discretionarily pursuant to § 1226(a), *i.e.*, if he were not subject to § 1225(b).
[10] Pursuant to his pending asylum petition, Mr. Hyppolite applied for and received his employment authorization card in the mail a few days before he was detained. Hyppolite Decl. at ¶ 29.

Status ("TPS") in January 2025; his TPS application also remains pending. *Id.* at ¶ 25.[11]

Respondents do not claim to have provided Mr. Hyppolite with any notice or opportunity to be heard, nor do they contest any of the material facts of this case.

## STATUTORY AND REGULATORY BACKGROUND

The INA prescribes three basic forms of detention for the vast majority of noncitizens. First, 8 U.S.C. § 1226 authorizes the detention of noncitizens in full removal proceedings before an IJ pursuant to 8 U.S.C. § 1229a. 8 U.S.C § 1226(a) provides the default rule that the Attorney General may detain a noncitizen subject to removal proceedings. And, 8 U.S.C. § 1226(c) provides for mandatory detention of certain "criminal aliens." *See id.* Second, the INA provides for mandatory detention of noncitizens subject to expedited removal under 8 U.S.C. § 1225(b)(1) and for other recent arrivals seeking admission, pursuant to § 1225(b)(2). Lastly, the INA provides for detention of noncitizens who are subject to a final order of removal. 8 U.S.C. § 1231(a)–(b). Each of these provisions brings specific statutory and regulatory requirements.

### *Detention Under 8 U.S.C § 1225*

Section 8 U.S.C. § 1225(a)(1) defines an "applicant for admission" as a noncitizen who is seeking entry into the United States at a port of entry or through other means. 8 U.S.C. § 1225(a)(1) ("[a noncitizen] who has not been admitted or arrives in the United States"). The INA

---

[11] Mr. Hyppolite is eligible for TPS—he meets each of the statutory requirements: he has been continuously physically present since the effective date of the most recent designation of TPS for Haiti; he has continuously resided in the United States since the date designated by DHS; and none of the immigration or criminal bars in the TPS statute apply to him. 8 U.S.C. §§ 1254a(c)(1)(A)(i)-(iii), (c)(2)(A)-(B); *see also Nat'l TPS Alliance v. Noem*, ---F. Supp. 3d ----, No. 25-cv-1766 (EMC), 2025 WL 2578045 (N.D. Cal. Sept. 5, 2025) (entering final judgment in favor of plaintiffs challenging DHS' purported termination of its most recent redesignation of Haiti for TPS), *appeal docketed* No. 25-5724 (9th Cir. 2025).

Notably, noncitizens are eligible for TPS even if they are inadmissible under 8 U.S.C § 1182(a)(7)(A), as DHS alleges in Mr. Hyppolite's case. 8 U.S.C. § 1254a(c)(2)(A)(i). *See* Ex. 1. The TPS statute also contains several criminal bars to eligibility, 8 U.S.C. § 1254a(c)(2)(B), but none of which apply to Mr. Hyppolite, as he has no criminal history. Hyppolite Decl. at ¶ 3.

[11] Applicants for asylum are only authorized to submit an application for work authorization 150 days after submitting their application for asylum. 8 C.F.R. § 208.7(a).

further defines "admission" as "the lawful entry of [a noncitizen] into the United States after inspection and authorization by an immigration officer." 8 U.S.C § 1101(a)(13). The phrase "seeking admission" is undefined in the statute but necessarily implies some sort of present-tense action. *Lopez Benitez v. Francis*, No. 25-cv-5937 (DEH), 2025 WL 2371588 at * 6 (S.D.N.Y. Aug. 13, 2025).

- ### *Section 1225(b)(1)*

Congress created "expedited removal" as method for rapidly removing certain noncitizens from the United States with very few procedural protections. 8 U.S.C. § 1225(b)(1). Expedited removal is only applied to noncitizens "who have not been admitted or paroled" or who are determined to be inadmissible under either 1182(a)(6)(C) (fraud or misrepresentation) or 1182(a)(7) (lack of valid travel document). *See* 8 U.S.C. § 1225(b)(1)(A)(i). No other person may be subjected to expedited removal. 8 C.F.R. § 235.3(b)(1), (b)(3). An immigration officer must also determine whether the noncitizen "has been physically present in the United States continuously for the 2-year period immediately prior to the date of the determination of inadmissibility." 8 U.S.C. § 1225(b)(1)(A)(iii)(II). And, if a noncitizen expresses fear of return to their country of origin, the statute provides for a credible fear interview, which—if positive—leads to their placement in full removal proceedings. 8 U.S.C. § 1225(b)(1)(A)(i)-(ii).

- ### *Section 1225(b)(2)*

Section 1225(b)(2) provides that "in the case of [a noncitizen] who is an applicant for admission, if the examining immigration officer determines that [a noncitizen] *seeking admission* is not clearly and beyond a doubt entitled to be admitted, the [noncitizen] shall be detained." 8 U.S.C. § 1225(b)(2)(A) (emphasis added). The plain text and broader statutory scheme dictate that Section 1225(b)'s provision for mandatory detention does not apply to people who are

already present in the United States at the time of re-detention. *See e.g*., *Lopez Benitez,* 2025 WL 2267803, at *5 (citing *Gomes v. Hyde*, No. 1:25-cv-11571-JEK, 2025 WL 1869299, at *7 (D. Mass. July 7, 2025)); *Martinez v. Hyde*, No. 25-111613-BEM, 2025 WL 2084238, at *8 (D. Mass. July 24, 2025)).

### *Detention Under 8 U.S.C. § 1226(a)*

Pursuant to 8 U.S.C. § 1226(a), a noncitizen may be detained "upon a warrant issued by the Attorney General," and "may be arrested and detained pending a decision on whether the [noncitizen] is to be removed from the United States." 8 U.S.C. § 1226(a). Noncitizens in § 1226(a) detention are generally entitled to a bond hearing at the outset of their detention, *see* 8 C.F.R. §§ 1003.19(a), 1236.1(d), while noncitizens who have been arrested, charged with, or convicted of certain crimes are subject to mandatory detention. *See* 8 U.S.C. § 1226(c). Regulations also authorize immigration officers to exercise their discretion to release a noncitizen pending the completion of their immigration proceedings. 8 C.F.R. § 236.1(c)(8).

## ARGUMENT

## I.    SECTION 1225 IS NOT A LEGAL BASIS FOR MR. HYPPOLITE'S DETENTION

Respondents' opposition relies on the premise that Mr. Hyppolite, who has been living in the United States for nearly three years, can be subject to mandatory detention under 8 U.S.C. § 1225(b)(2)(A). **This premise is wrong**. Section 1225(b)'s mandatory detention of "[noncitizens] seeking admission" applies only to arriving or recently apprehended entrants—not to someone like Mr. Hyppolite who has been physically present in the United States for several years and is in full removal proceedings under 8 U.S.C. § 1229a. *See, e.g.*, *Munoz Materano v. Artera*, No. 25-cv-6137 (ER), 2025 WL 2630826, at *11 (S.D.N.Y. Sept. 12, 2025) (finding that

§ 1225(b) did not authorize detention of a noncitizen in Petitioner's position); *Lopez Benitez,* 2025 WL 2371588, at *5 (holding that § 1225(b)(2)(A) did not apply to a noncitizen who had resided in the U.S. for years before being detained); *Velasco Lopez*, 978 F.3d at 849 (recognizing detention of noncitizens in full removal proceedings is not governed by § 1225). Respondents' efforts lack support in the statutory text, governing case law, and decades of practice.

A.    **Mr. Hyppolite is in full removal proceedings under 8 U.S.C. § 1229a and is not "seeking admission."**

There is no dispute that Mr. Hyppolite is currently in full removal proceedings, pursuant to 8 U.S.C. § 1229a, and is not in expedited removal proceedings, pursuant to 8 U.S.C. § 1225. Gov't Opp. at 5; *see also Munoz Materano v. Artera*, 2025 WL 2630826, at *11 ("[Section] 1225] does not authorize expedited removal of individuals who have ever been paroled into the U.S. under either of its provisions.") (citation omitted). When Respondents placed Mr. Hyppolite in § 1229a proceedings, as opposed to expedited removal, they vested him with the rights Congress guaranteed to noncitizens in those proceedings. *See Mata Velasquez*, 2025 WL 1953796, at *9 ("Although [noncitizens] who petition for admission have no constitutional rights regarding their applications, they do have such statutory rights as Congress grants." (citing *Augustin v. Sava*, 735 F.2d 32, 36 (2d Cir. 1984) (footnote omitted)); *see also* 8 C.F.R § 1003.12, *et seq*. (providing rules of procedure for § 1229a removal proceedings).

Section 1225(b)(2)(A) applies to noncitizens "seeking admission," rather than those already present. Section 1225(b) addresses the inspection and detention of noncitizens at the threshold of entry. By its terms, § 1225(b)(2)(A) mandates detention when "the examining immigration officer determines that [a noncitizen] seeking admission is not clearly and beyond a doubt entitled to be admitted." 8 U.S.C. § 1225(b)(2)(A). The ordinary meaning of "seeking

9

admission" connotes an active attempt to enter – something that occurs at a port of entry or near the border, not years after an unlawful entry. As the *Lopez Benitez* court aptly illustrated, "someone who enters a movie theater without purchasing a ticket and then sits through the first few minutes of a film would not ordinarily be described as 'seeking admission' to the theater. Rather, that person would be described as already present there." *Lopez Benitez,* 2025 WL 2371588, at *7. Likewise, here, Mr. Hyppolite has been present in the country for an extended period; he does not fit the commonsense understanding of an alien "seeking admission" now. He is inside the theater, so to speak, not waiting at the door. *See also Munoz Materano,* 2025 WL 2630826, at *11.

This reading is reinforced by the statutory context and structure. The INA's detention scheme draws a fundamental line between two classes of aliens: (a) those "seeking admission into the country," who are dealt with under § 1225(b), and (b) those "already in the country" (even if here unlawfully). In other words, § 1225 governs the initial intake of arriving aliens, not the custody of individuals who have entered the U.S. (lawfully or not) and are in removal proceedings. Congress deliberately created these distinct regimes, and courts (and even the Attorney General) have long recognized that § 1225 does not apply to all classes of aliens. The Court should refuse to credit the Government's position that Mr. Hyppolite is subject to § 1225(b) after he has been residing in the interior for the last almost 3 years.[12]

> **B.**  **The BIA decisions in *Matters of Q. Li* and *Yajure Hurtado* do not control and are inapposite here.**

---

[12] Moreover, Respondents' reading also fails to account for the recent amendment codified at 8 U.S.C. § 1226(c). Laken Riley Act, PL 119-1, 139 Stat. 3 (Jan. 29, 2025). If, *arguendo*, Respondents' interpretation was correct, "'then the 2025 amendment,' requiring detention for noncitizens who are both inadmissible and meet certain criminal criteria, 'would have no effect.'" *Martinez*, 2025 WL 2084238, at *7 (citing *Gomes*, 2025 WL 1869299, at *7) (emphasis in original). In other words, Respondents' interpretation would "render superfluous another part of the statutory scheme" and contravene the canon against surplusage. *Marx v. Gen. Revenue Corp.*, 568 U.S. 371, 386 (2013).

Respondents lean on two recent BIA precedent cases—*Matter of Q. Li*, 29 I. & N. Dec. 66 (BIA 2025), and *Matter of Yajure Hurtado*, 29 I. & N. Dec. 216 (BIA 2025)—that misconstrue the INA and upend decades of statutory interpretation and agency practice. The Court is not bound by these decisions and, in conducting its own statutory analysis, should decline to follow them for the reasons above. *See, e.g.*, *Loper Bright Enters. v. Raimondo*, 603 U.S. 369, 394 (2024) ("[C]ourts must exercise independent judgment in determining the meaning of statutory provisions.").

In *Yajure Hurtado*, the BIA departed from decades of consistent practice by holding, for the first time, that § 1225(b)(2) extends to noncitizens apprehended in the interior after an unlawful entry. That interpretation is not binding on this Court, and it lacks persuasive force. The Board offered no analysis of Congress's deliberate division between §§ 1225 and 1226 and failed to reconcile its holding with the statutory text limiting § 1225(b)(2)(A) to aliens "seeking admission." Courts have rightly declined to follow *Yajure*, recognizing that it erases the longstanding boundary between "arriving aliens" at the threshold and individuals already present in the United States. *See, e.g.*, *Salcedo Aceros v. Kaiser*, No. 25-cv-06924 (EMC), 2025 WL 2637503, at *8-9 (N.D. Cal. Sept. 12, 2025) (holding § 1225(b)(2)(A) inapplicable to a noncitizen who had lived in the U.S. since 2024 and rejecting DHS's "switching tracks" post litigation); *Beltran Barrera v. Tindall*, No. 3:25-cv-541 (RGJ), 2025 WL 2690565, at *5 (W.D. Ken. Sept. 19, 2025) (rejecting *Yajure*); *Maldonado Vazquez v. Feeley*, 2025 WL 2676082, at *19-23 (D. Nev. Sept. 17, 2025) (same); *Sampiao v. Hyde*, No. 1:25-cv-11981 (JEK), 2025 WL 2607924, at *8 n.11 (D. Mass. Sept. 9, 2025) (same).

In *Q. Li*, the BIA addressed whether § 1225(b) governed the detention of a noncitizen paroled at a port of entry, released under strict reporting conditions, and re-detained following

the issuance of an Interpol Red Notice. 29 I&N Dec. at 67. The BIA concluded that such "arriving aliens" are covered by § 1225(b)(2) until the end of their removal proceedings. In the instant matter, Mr. Hyppolite was paroled into the U.S., released with no conditions, and he has no criminal history in Haiti, the United States, or elsewhere. Hyppolite Decl. at ¶¶ 3, 22-23,28.

In short, neither *Q. Li* nor *Yajure Hurtado* compels this Court to accept Respondents' theory. Article III courts, not the BIA, have the final word in habeas cases. These BIA decisions cannot be stretched to justify Respondents' unlawful reclassification of Mr. Hyppolite's custody.

## II.    MR. HYPPOLITE'S DETENTION VIOLATES HIS CONSTITUTIONAL RIGHT TO DUE PROCESS

### A.    The Court should reject Respondents' breathtaking argument that Mr. Hyppolite has no constitutional due process rights.

Regardless of the statute authorizing his detention, the Court should order Mr. Hyppolite's release to remedy Respondents' violations of his due process rights. To begin, the Court must reject Respondents' breathtaking argument that the Constitution does not afford Mr. Hyppolite due process rights because the government considers him an "applicant for admission." Gov't. Opp. at 13-15. *See, e.g.*, *Munoz Materano*, 2025 WL 2630826, at \*12 (rejecting the same contention); *Mata Velasquez*, 2025 WL 1953796, at \*8 n.9 (same). The Fifth Amendment provides that "[n]o person shall . . . be deprived of life, liberty, or property, without due process of law," U.S. Const., amend. V, and noncitizens, regardless of how they entered the United States, are entitled to due process of law. *See Reno v. Flores*, 507 U.S. 292, 306 (1993) ("It is well established that the Fifth Amendment entitles aliens to due process of law in deportation proceedings.").

Seeking to evade their obligations under the Due Process Clause, Respondents invoke the inapposite holdings in *DHS v. Thuraissigiam*, 591 U.S. 103, 140 (2020) and *Shaughnessy v. United States ex rel. Mezei*, 345 U.S. 206 (1953). First, *Thuraissigiam* was not a challenge to the

constitutionality of detention. *See id*. at 117 (noting that the petitioner "did not ask to be released."). Rather, the case questioned whether a noncitizen apprehended 25 yards from the United States border had constitutional rights regarding his application for admission to the United States. The Court concluded that—as it relates to *admission* into the United States— noncitizens apprehended at the border have only those procedural rights as Congress provides. *See id*. ("Although [noncitizens] who petition for admission have no constitutional rights *regarding their applications*, they do have such statutory rights as Congress grants.") (emphasis added) (footnote omitted).

*Mezei* is also factually distinguishable. *See, e.g.*, *Bermudez Paiz v. Decker*, No. 18-cv-4759 (GHW) (BCM), 2018 WL 6928794 at *12 (S.D.N.Y. Dec. 27, 2018) ("[] I cannot read *Mezei* as holding categorically that arriving aliens have no due process rights beyond whatever procedures happen to be authorized by Congress at the time. The case is too tightly bound to its idiosyncratic facts to support such a stark conclusion." (cleaned up)). *Mezei* was a noncitizen who was permanently excluded from the United States on national security grounds. *Mezei*, 345 U.S. at 207, 216. Unlike Mr. Hyppolite, *Mezei* was not an asylum seeker who passed a credible fear interview and has "colorable grounds" for being in the United States. *Bermudez Paiz*, 2018 WL 6928794 at *11. Mr. Hyppolite has multiple "colorable grounds" that may allow him to stay in the U.S., including prima facie eligibility for TPS, asylum, and a family-based petition. *See also U.S. ex rel. Paktorovics v. Murff, 260* F.2d 610 (2d Cir. 1958) (noting that noncitizens granted parole had constitutional due process rights because they had been "invited" into the country pursuant to executive policy); *accord Mata Velasquez*, 2025 WL 1953796, at *12 (discussing *Paktorovics*).

13

Courts have consistently reaffirmed that due process protects noncitizens from unreasonable detention, regardless of the statute that authorizes their detention. Even before the recent radical expansion in detention under purported § 1225(b) authority, courts around the country found that Due Process Clause protects people detained under § 1225(b) from unreasonable detention. *See, e.g.*, *A.L. v. Oddo*, 761 F. Supp. 3d 822, 825-26 (W.D. Pa. 2025); *Leke v. Hott*, 521 F. Supp. 3d 597, 604–05 (E.D. Va. 2021); *Arechiga v. Archambeault*, No. 2:25-cv-600 (CDS) (VCF), 2023 WL 5207589, at *3 (D. Nev. Aug. 11, 2023); *Bermudez Paiz*, 2018 WL 6928794, at *10 (citing cases).[13] While these claims arose in the context of prolonged detention, the principle applies with equal force here, where Respondents' detention—with no allegation that it is justified due to danger or flight risk—has been unreasonable from the moment Mr. Hyppolite was detained. *See, e.g.*, *Mata Velasquez*, 2025 WL 1953796, at *3, 18 (ordering release from § 1225(b) detention in light of due process violation); *See, e.g.*, *Munoz Materano*, 2025 WL 2630826, at *12 (same).

The Court should reject the meritless, recycled contention that the Constitution does not protect Mr. Hyppolite from unreasonable detention.[14]

---

[13] To counsels' knowledge, no court in the Second Circuit has adjudicated a post-*Thurassigiam* petition alleging unreasonably prolonged detention under § 1225(b). However, in addition to the authority cited in other circuits, the Southern District's decision in *Bermudez Paiz* remains persuasive authority. *See, e.g.*, *A.L.*, 761 F. Supp at 826 (affirming validity of *Pierre v. Doll*, 350 F. Supp. 3d 327, 332 (M.D. Pa. 2018), a pre-*Thurassigiam* decision recognizing the due process rights of people detained pursuant to § 1225(b)).

[14] Respondents devote a large portion of their due process section to distinguishing Mr. Hyppolite's claim from *Valdez v. Joyce*, 25-cv-4627, 2025 WL 1707737 (S.D.N.Y. June 18, 2025), a decision cited in Mr. Hyppolite's pro se petition. *See* Gov. Opp. at 17-18. Respondents' comments on *Valdez* are largely irrelevant because DHS has not attempted to place Mr. Hyppolite in expedited removal proceedings, and he is therefore not challenging a decision to institute expedited removal proceedings. *Cf. id.*; *but see also Munoz Materano*, 2025 WL 2630826, at *9 (finding jurisdiction to review placement in expedited removal). Moreover, Respondents' discussion of the statutory holding in *Valdez* is also inapposite because Mr. Hyppolite's due process claims do not rest on the statute under which he is detained.

**B.**    **Respondents have flagrantly violated Mr. Hyppolite's right to procedural due process.**

**1.**    **Respondents flagrantly ignored their duty to provide notice and committed numerous errors in detaining Mr. Hyppolite.**

Mr. Hyppolite's detention violates his procedural rights under the Due Process Clause. "[A]n essential principle of due process is that a deprivation of life, liberty, or property 'be preceded by notice and opportunity for hearing appropriate to the nature of the case.'" *Cleveland Bd. of Educ. v. Loudermill*, 470 U.S. 532, 542 (1985) (quoting *Mullane v. Cent. Hanover Bank & Trust Co.*, 339 U.S. 306, 313 (1950)). Respondents provided Mr. Hyppolite with no notice before detaining him. In fact, the documents Respondents issued after taking him into custody were misleading, erroneous, and inconsistent with their position in this litigation. *See supra* at 5; *cf. DHS v. Regents of the Univ. of Cal.*, 591 U.S. 1, 22, 24 (2020) (noting, in the APA context, that "[t]he basic rule here is clear: An agency must defend its actions based on the reasons it gave when it acted," not on "impermissible post hoc rationalizations"). Through their Form I-286, Notice of Custody Determination, Respondents told Mr. Hyppolite that he would receive custody review before a neutral decision maker. *See* Ex. 3. Respondents have not, of course, provided Mr. Hyppolite with that review and now argue that they have no authority to do so. Gov't. Opp. at 13. Respondents also failed to provide Mr. Hyppolite notice of his immigration hearing and botched their recitation of the history of his case in their I-213, Record of Deportable/Inadmissible Alien, an official document that would normally "entail" a "presumption of regularity." *See* Ex. 2, *Cf. Vera Punin v. Garland*, 108 F.4th 114, 126 (2d Cir. 2024). In the meantime, Mr. Hyppolite remains detained at MDC with no opportunity to be heard.

This kind of bait and switch cannot possibly constitute notice or satisfy due process. *See, e.g.*, *Mullane*, 399 U.S. at 314 ("[N]otice must be of such nature as reasonably to convey the

15

required information."); *Gayle v. Johnson*, 81 F. Supp. 371, 386 (D.N.J. 2015) ("[I]f an alien is not apprised of his or her detention status, it follows that the alien would not know, and the form fails to indicate, the type of custody redetermination hearing to which he or she is entitled."), *vacated on other grounds sub. nom Gayle v. Warden Monouth Cnty. Corr. Inst.*, 838 F.3d 297 (3d Cir. 2016).

The principle that Mr. Hyppolite must have received notice before his re-detention applies regardless of the statute purportedly authorizing his detention, and courts have ordered release from ICE custody to remedy such notice violations. *See, e.g.*, *Martinez v. McAleenan*, 385 F. Supp. 3d 349, 364 (S.D.N.Y. 2019) ("[E]ven though eliminating an alien's right to a hearing may pass constitutional muster, depriving an alien with substantial ties to the United States of *both* written notice and a hearing *before* detaining him for several months . . . fundamentally violates the Due Process Clause of the Fifth Amendment because it deprives him of any way to meaningfully contest the basis for his detention."). This Court should do the same to remedy Respondents' clear disregard for Mr. Hyppolite's constitutional rights.

## 2. The *Mathews* test demonstrates Respondents' due process violations.

The three-factor test articulated by the Supreme Court in *Mathews v. Eldridge*, 424 U.S. 319 (1976) provides the relevant framework "to determine what process is due to noncitizens in removal proceedings," *Black*, 103 F.4th at 147 (collecting cases). It confirms that Respondents have violated Mr. Hyppolite's rights under the Due Process Clause. The *Mathews* factors are: (1) "the private interest that will be affected by the official action"; (2) "the risk of an erroneous deprivation of such interest through the procedures used, and the probable value, if any, of additional or substitute procedural safeguards;" and (3) "the Government's interest, including the function involved and the fiscal and administrative burdens that the additional or substitute

procedural requirement would entail." *Mathews*, 424 U.S. at 335.

          **i.**       ***Mr. Hyppolite's liberty interest weighs heavily in his favor.***

The first *Mathews* factor weighs heavily in Mr. Hyppolite's favor. The Second Circuit has repeatedly held in challenges to immigration detention that "the private interest affected by the official action is the most significant liberty interest there is—the interest in being free from imprisonment." *Black*, 103 F.4th at 151 (quoting *Velasco Lopez*, 978 F.3d at 851). As the court has observed, "[c]ase after case instructs us that in this country liberty is the norm and detention is the carefully limited exception." *Id.* (quoting *Velasco Lopez*, 978 F.3d at 851) (cleaned up). "That is especially so here where [Mr. Hyppolite] followed all the rules and '[t]he deprivation that [he] experienced was not the result of a criminal adjudication' or even the suggestion that he did anything that was wrong in any way." *Mata Velasquez*, 2025 WL 1953796, at *16 (quoting *Velasco Lopez*, 978 F.3d at 851). Nor is it the result of any flight risk or danger. Complying with all the requirements for pursuing immigration relief, Mr. Hyppolite has applied for TPS, for which he is *prima facie* eligible, and for asylum, and his father has filed a family-based immigration petition on his behalf. Not only are Respondents denying Mr. Hyppolite his liberty, but they are detaining him in a criminal setting at a facility with troubling reports of abuse, mismanagement, and attempts to evade public scrutiny.[15] His liberty interest weighs heavily in his favor.

---

[15] *See, e.g.*, Katie Rose, et al., *Lockdowns, Violence, and "Barbaric Conditions" in a Federal Jail Known for its Famous Detainees*, The Appeal (June 30, 2025), https://theappeal.org/brooklyn-metropolitan-detention-center-solitary-watch/ (describing "unsanitary and unsafe conditions" at MDC, grotesque food and almost nonexistent medical care."); Press Release, Rep. Dan Goldman, *ICE and Bureau of Prisons Deny Reps. Goldman, Espaillat and Velazquez Access to MDC Brooklyn Amid Reports of Inhumane Conditions* (Aug. 6, 2025), https://goldman.house.gov/media/press-releases/ice-and-bureau-prisons-deny-reps-goldman-espaillat-and-velazquez-access-mdc.

### ii.     As Respondents' errors and confusion shows, Mr. Hyppolite faces an elevated risk of erroneous deprivation.

As for the second *Mathews* factor, the erroneous deprivation of Mr. Hyppolite's liberty is the direct result of the insufficient safeguards and procedures used to initiate and continue his detention. The government purports to detain Mr. Hyppolite under the authority of § 1225(b), which contains "almost nonexistent procedural protections," *cf. Black*, 103 F.4th at 152,[16] and, critically, no opportunity to seek release before a neutral adjudicator. *See* 8 C.F.R. § 1003.19(h)(2)(i)(B) (noting an IJ "may not" conduct a custody hearing). The limited review available is to seek release from ICE, the agency incarcerating him. *See* 8 U.S.C. § 1182(d)(5)(A). But due process requires a *neutral* adjudicator. *See, e.g.*, *Hechavarria v. Whitaker*, 358 F. Supp. 3d 227, 239 (W.D.N.Y. 2019) (finding "detention could not continue without close scrutiny by a neutral decisionmaker"); *St. John v. McElroy*, 917 F. Supp. 243, 249 (S.D.N.Y. 1996), *as amended* (May 7, 1996). This lack of "procedural protections . . . markedly increase[s] the risk of an erroneous deprivation of Petitioner['s] private liberty interests." *Black*, 103 F.4th at 152.

Respondents' record in this case confirms the elevated risk of erroneous deprivation Mr. Hyppolite faces. Respondents at the very least appear to be confused about the statute that authorizes Mr. Hyppolite's detention, providing him with paperwork that would only be appropriate for detention pursuant to § 1226 and proving unable to accurately recount his encounter at the border. Now, Respondents argue that Mr. Hyppolite's detention is mandatory,

---

[16] While *Black* concerned mandatory detention of "criminal aliens" under § 1226(c) rather than applicants for admission under § 1225(b), both statutes contain minimal procedural safeguards and do not provide for any custody review before a neutral adjudicator. *See, e.g.*, 103 F.4th at 152 (discussing procedures).

while still citing to documents used for discretionary detention. *See* Gov't. Opp. at 6 "(After his hearing, ICE took Petitioner into custody under INA § 235(b)(2)(A), 8 U.S.C. § 1225(b)(2)(a).")(*citing* Form I-286, Notice of Custody Determination, *see* Ex. 3). Moreover, Respondents' failure to provide notice of Mr. Hyppolite's immigration hearing created a serious risk that he would be erroneously deprived of his right to pursue the immigration relief for which he is eligible. Finally, Respondents failed to meet this Court's deadline for responding to the Petition due to admitted "inadvertan[ce]." S*ee* ECF 7, Ltr. In Response to Court's Orders. During that time that they had "overlooked" the Petition, *see id*., Respondents could have reviewed it and considered whether to discretionarily release Mr. Hyppolite or grant him a bond hearing.

The record reinforces the Second Circuit's concerns with the minimal procedures available to Mr. Hyppolite. *See Black*, 103 F.4th at 152 (noting, in the context of § 1226(c), that the statute's "broad reach means that many noncitizens are detained 'who, for a variety of individualized reasons, are not dangerous, have strong family and community ties, are not flight risks and may have meritorious defenses to deportation at such time as they are able to present them.'") (discussing risk of erroneous deprivation) (*quoting Lora v. Shanahan*, 804 F.3d 601, 605 (2d Cir. 2015), *abrogated on other grounds* 583 U.S. 1165 (2018).

Respondents' statements regarding Mr. Hyppolite's access to counsel claim further illustrate the elevated risk of erroneous deprivation. Respondents seem to insinuate that because he was assigned counsel *after* being detained, his claims are "not true." Gov't. Opp. at 17. But Mr. Hyppolite's *pro se* petition details his detention for six days at 26 Federal Plaza—before he was able to retain immigration counsel—where he was given one non-confidential phone call a day for five minutes without exception and not allowed to contact any non-profit that could help

facilitate counsel. *Pro Se* Pet. ¶¶ 13, 17.[17] Such blatant disregard for Mr. Hyppolite's due process rights demonstrates an elevated risk of erroneous deprivation.

      To protect against this elevated and proven risk of erroneous deprivation, the government must release Mr. Hyppolite, not transfer him out of this Court's jurisdiction during the pendency of his immigration proceedings, and ensure that he receives notice and an opportunity to be heard before any re-detention. Numerous courts have ordered this remedy in light of Respondents' violations of due process in re-detaining noncitizens who, like Mr. Hyppolite, have been at liberty in the United States and pose neither a flight risk nor a danger. *See, e.g.*, *Mata Velasquez*, 2025 WL 1953796, at *18; *Munoz Materano*, 2025 WL 2630826, at *20; *Leon Espinoza v. Kaiser*, No. 1:25-cv-1101 (JLT) (SKO), 2025 WL 2675785, at *14 (E.D. Cal. Sept. 18, 2025). As in those cases, Respondents here have evinced an "absence of any deliberative process prior to, or contemporaneous with, the deprivation." *Lopez v. Sessions*, No. 18-cv-4189 (RWS), 2018 WL 2932726, at *15 (S.D.N.Y. June 12, 2018) (ordering release of re-detained unaccompanied minor); *see also Martinez*, 385 F. Supp. 3d at 364 ("The second prong – risk of erroneous deprivation of that interest – was extremely high because Petitioner was not given the time and ability to strategize how to contest [the reinstatement of his removal order], which he claims he will still do on the merits, and which is the very purpose of requiring advanced written notice before a deprivation.") (ordering release).

      Thus, the second *Mathews* factor also weighs in Mr. Hyppolite's favor.

      ***iii.    The government has no interest that outweighs the first two factors.***

      The third *Mathews* prong also weighs in Mr. Hyppolite's favor. The government does not allege Mr. Hyppolite is a danger or a flight risk, and he has attended every immigration hearing

---

[17] *See, e.g., Mercado v. Noem*, No. 25-CV-6568 (LAK), 2025 WL 2658779, at *2 (S.D.N.Y. Sept. 17, 2025) ("[Detailing] detainees' communications with legal counsel [at 26 Federal Plaza] were severely limited. Detainees' only access to legal counsel, if any, was through sporadic, time-restricted, monitored phone calls.")

scheduled in his case—including a hearing for which he did not receive notice. Hyppolite Decl. at ¶31. Therefore, the additional process sought would "do nothing to undercut" the government's interests in efficiently administering the immigration laws, in protecting the community, or in ensuring his appearance at future hearings. *See, e.g.*, *Black*, 104 F.4th at 153. Releasing Mr. Hyppolite would only reduce the fiscal and administrative costs associated with his continued detention and removal proceedings. Indeed, Respondents are spending thousands of dollars to detain Mr. Hyppolite in a Bureau of Prisons jail for no reason. *See, e.g.*, Alternatives to Detention, ICE https://www.ice.gov/features/atd, last updated Feb. 27, 2025 (stating that the daily cost of immigration detention is "around $152 per day."). Additional procedures prior to re-detention would at most place "minimal" administrative and fiscal burdens on Respondents, which "likely would be outweighed by costs saved by reducing unnecessary detention." *Black*, 103 F.4th at 154-55 (describing burden of conducting bond hearings).

Because all three *Mathews* factors weigh heavily in Mr. Hyppolite's favor, this Court should find that Respondents have violated his right to procedural due process and that he is entitled to immediate release.

### C. Mr. Hyppolite's continued detention deprives him of liberty in violation of substantive due process.

Mr. Hyppolite's detention furthermore violates his substantive due process rights. "Freedom from imprisonment—from government custody, detention, or other forms of physical restraint— lies at the heart of the liberty that [the Due Process] Clause protects." *Zadvydas v. Davis*, 533 U.S. 678, 690 (2001). Noncitizens unquestionably have a substantive liberty interest to be free from detention. *See id*. Because "liberty is the norm, and detention prior to trial or without trial is the carefully limited exception," the government may imprison people as a preventive measure only within strict limits. *Foucha v. Louisiana*, 504 U.S. 71, 83 (1992)

(*quoting U.S. v. Salerno*, 481 U.S. 739, 755 (1987)). Immigration detention is civil and must "bear[] a reasonable relation to the purpose for which the individual [is] [detained]" so that it remains "nonpunitive in purpose and effect." *Zadvydas*, 533 U.S. at 690 (cleaned up); *see also Schall v. Martin*, 467 U.S. 253, 264 (1984) (finding detention must be a proportional—not excessive—response to a legitimate state objective).

The Supreme Court has stated that there are only two legitimate purposes for immigration detention: mitigating flight risk and preventing danger to the community. *See Zadvydas*, 533 U.S. at 690; *see also Velasco Lopez*, 978 F.3d at 853-54; *Faure v. Decker*, No. 15-cv-5128, 2015 WL 6143801, at *3 (S.D.N.Y. Oct. 19, 2015) (ordering release or a bond hearing where there was "no evidence" that the habeas petitioner "poses a danger to the public or would flee during the pendency of the removal proceedings."). Respondents do not allege that Mr. Hyppolite's detention is justified based on flight risk or danger.

As is clear from his attendance at immigration hearings, Mr. Hyppolite is not a flight risk. Mr. Hyppolite has followed all the procedures and requirements of the immigration system, including attending his immigration hearings since release from custody at the border. *See also Saravia v. Sessions*, 280 F. Supp. 3d 1168, 1176 (N.D. Cal. 2017), *aff'd sub nom. Saravia for A.H. v. Sessions*, 905 F.3d 1137 (9th Cir. 2018) ("Release reflects a determination by the government that the noncitizen is not a danger to the community or a flight risk."). In that time, he has also deepened his ties to the United States, earning his GED and supporting his family in the United States. Hyppolite Decl. ¶ 32. Mr. Hyppolite is also not a threat to himself or the community. The government knows this. Mr. Hyppolite has no criminal history. *See id.* ¶ 3. No government has ever accused him of a crime, *see id.*, and Respondents' submission contains

neither an allegation of danger nor evidence that would support an inference that, if at liberty, he would present a danger to the community. *See*, *e.g.*, Ex. 2 (indicating no criminal history).

The government is not detaining Mr. Hyppolite to serve its legitimate interests in protecting denizens against danger or preventing flight risk. Because the basis for Mr. Hyppolite's detention bears no "reasonable relation" to the government's interests in preventing flight and danger, *Jackson v. Indiana*, 406 U.S. 715, 738 (1972), the Court should order his release. "[W]hile [DHS] might want to enforce this country's immigration laws efficiently, it cannot do that at the expense of fairness and due process." *Ceesay v. Kurzdorfer*, 781 F. Supp. 3d 137, 144 (W.D.N.Y. 2025) (citation omitted).

Mr. Hyppolite's prima facie eligibility for TPS makes his removal a remote possibility at best and therefore reinforces the conclusion that his detention violates substantive due process. Congress explicitly prohibited the removal of noncitizens granted TPS, even if they are subject to a final order of removal. 8 U.S.C. §§ 1254a(a)(1)(A), (c)(1)(A). The TPS statute further provides that, "[i]n the case of a [noncitizen] who establishes prima facie eligibility for [TPS benefits], until a final determination with respect to the [noncitizen's] eligibility for such benefits . . . has been made, the [noncitizen] *shall be provided such benefits*." 8 U.S.C. § 1254a(a)(4)(B) (emphasis added). Mr. Hyppolite is prima facie eligible for TPS, and Respondents provide no reason to believe he will not be granted TPS once USCIS adjudicates his application. Even if, *arguendo*, he were otherwise removable from the United States, this prima facie eligibility for TPS prohibits Respondents from removing him. While Haiti's designation for TPS may end at some point in the future, its current designation period lasts until February 3, 2026. *See Nat'l TPS Alliance*, 2025 WL 2578045, at *10-11, 41. Under such circumstances, Mr. Hyppolite's detention serves no legitimate purpose. *See, e.g., Salad v. Dep't*

*of Corr.*, 769 F. Supp. 3d 913, 935 (D. Alaska 2025) ("Federal Respondents did not offer any evaluation of Petitioner's likelihood of receiving TPS, and did not identify any potential basis on which Petitioner's TPS application could be denied.  Detention under these circumstances is simply too disconnected from the statute's purpose of accomplishing the removal of noncitizens subject to a final removal order.");[18] *see also Zadvydas*, 533 U.S. at 679, 690 (noting that the flight risk justification "is weak or nonexistent when removal seems a remote possibility at best" and that, "once the flight risk justification evaporates, the only special circumstance is the alien's removable status, which bears no relation to dangerousness.").

Last, Mr. Hyppolite's U.S. citizen father filed an I-130, Petition for Alien Relative on his behalf. *See* Ex. 4, USCIS Receipt Notice, I-130. Mr. Hyppolite is prima facia eligible to adjust status in the U.S. pursuant to 8 U.S.C § 1255, INA § 245(a) because he was paroled into the U.S. and appears to have no inadmissibility grounds. His eligibility for adjustment of status reinforces his right to release from detention. *See, e.g.*, *You v. Nielsen*, 321 F. Supp. 3d 451, 465, 469 (S.D.N.Y. 2018) ("Section 1255 and the amended regulation, 8 C.F.R. § 245.2(a)(1), afford Petitioner an opportunity to seek adjustment of status with the USCIS but, at the same time, he risks removal before being able to complete the adjustment of status process. Without court intervention, therefore, such as via a stay of removal, the statutory opportunity to seek adjustment of status will prove to be a mere illusion.") (quotation marks and citation omitted) (granting stay of removal and ordering release from ICE detention).

---

[18] *Salad* concerned a petitioner detained after the issuance of a final order of removal under 8 U.S.C.§ 1231(a)(6), which limits detention "to a period reasonable necessary to bring about [the noncitizen's] removal from the United States." *Zadvydas*, 533 U.S. at 689. The question therefore was whether his detention had become unreasonable because there was no "'significant likelihood of removal in the reasonably foreseeable future.'" *Salad*, 769 F. Supp. at 920 (*quoting Zadvydas*, 533 U.S. at 701).

*Salad* shows that, even if he is ordered removed in the future, his TPS eligibility and likely grant of TPS mean there are no circumstances under which the government could justify his detention.

Mr. Hyppolite's detention therefore violates his right to liberty under the substantive component of the Due Process Clause.

## III. RESPONDENTS HAVE VIOLATED THE APA

Respondents assert that the Administrative Procedure Act ("APA") is "not the proper vehicle for [Mr. Hyppolite's] claims arising out of his detention" and that such claims "fall within the 'core' of the writ of habeas corpus and must be brought in habeas." Gov't. Opp. at 19. This argument misreads both the statutes and the case law.

The federal habeas statute, 28 U.S.C. § 2241, protects against unlawful custody. The APA, by contrast, authorizes judicial review of unlawful agency action. These remedies do not overlap: habeas may provide release, but it cannot compel Respondents to cure their statutory violations.

The Supreme Court has long held that habeas jurisdiction in immigration detention cases remains available absent a clear congressional repeal. *INS v. St. Cyr*, 533 U.S. 289, 314 (2001). At the same time, the APA expressly allows review of final agency actions unless there is another "adequate remedy in a court." 5 U.S.C. § 704. Respondents invoke *Trump v. J.G.G.*, 604 U.S. 670 (2025) to argue that the APA is categorically unavailable. But *J.G.G.* addressed claims that were, in substance, direct challenges to confinement. Here, Mr. Hyppolite's APA claim challenges DHS's statutory and procedural violations. That challenge falls squarely within the APA's ambit, not the "core of habeas."

Respondents also argue that habeas is an "adequate remedy" under § 704. That is not so. Only the APA can remedy agency errors by requiring Respondents to act within the bounds of the INA. Courts regularly provide such APA review sought in habeas. *See, e.g.*, *Orellana v. Francis*, No. 25-cv-4212 (OEM), 2025 WL 2402780, at *5 (E.D.N.Y. Aug. 19, 2025); *Doe v. Noem*, 778 F.Supp. 3d 311, 330 (D. Mass. 2025); *Y-Z-L-H v. Bostock*, No. 3:25-cv-965 (SI),

2025 WL 1898025, at *12 (D. Or. July 9, 2025). Habeas and the APA are not mutually exclusive. Habeas addresses unlawful custody, while the APA addresses Respondents' statutory violations. Respondents' attempts to collapse these distinct remedies should be rejected.

In this case, Respondents have acted arbitrarily and capriciously in violation of the APA. At a minimum, Respondents were arbitrary and capricious in waffling about the statute that authorizes Mr. Hyppolite's detention in official records determining his rights and their obligations. *See, e.g.*, *Motor Vehicle Mfrs. Ass'n of the United States, Inc. v. State Farm Mut. Automobile Ins. Co.*, 463 U.S. 29, 43 (1983) (noting that an agency acts arbitrarily and capriciously when it "entirely fail[s] to consider an important aspect of the problem [or] offer[s] an explanation for its decision that rounds counter to evidence before the agency"); *Citizens to Preserve Overton Park, Inc. v. Volpe*, 401 U.S. 402, 416 (1971) ("[In conducting APA review,] the court must consider whether the decision was based on a consideration of the relevant factors and whether there has been a clear error of judgment."). The Court should find that Respondents acted arbitrarily and capriciously in violation of the APA.

## IV. THE EQUITABLE AND HUMANITARIAN CONSIDERATIONS WEIGH IN FAVOR OF MR. HYPPOLITE'S RELEASE

The equities in this case point decidedly in favor of freeing from Mr. Hyppolite from Respondents' unreasonable detention. Mr. Hyppolite has applied for several forms of immigration relief: TPS, asylum, and a family-based visa through his U.S. citizen father. Hyppolite Decl. ¶¶ 25, 28, 30. Mr. Hyppolite is prima facie eligible for TPS. *See* Ex. 5, USCIS Receipt Notice, TPS. Once USCIS adjudicates his application, there is nothing in the record to suggest that it will not be granted. As he waited to be eligible for work authorization,[19] Mr.

---

[19] Applicants for asylum are only authorized to submit an application for work authorization 150 days after submitting their application for asylum. 8 C.F.R. § 208.7(a).

Hyppolite obtained his GED, and he "was a caregiver for his elderly father and aunt, who suffered a stroke a couple of years ago that left her paralyzed." Hyppolite Decl. at ¶ 32. ██

████████████████████████████████████████████████████

████████████████████████. *See id.* ¶¶ 11-17. Mr. Hyppolite has never been arrested or charged with a crime Since reuniting with his family in the United States, Mr. Hyppolite has attended all his scheduled immigration hearings. *Id.* ¶¶ 23, 28. He has shown his commitment to following the required procedures by attending a hearing even when he did not receive proper notice. *See id.* ¶ 31.

Respondents have repaid these conscientious efforts to seek immigration relief with detention in jail-like conditions for no ostensible reason other than Mr. Hyppolite's presence in the building after an Immigration Court hearing. As in *Lopez Benitez v. Francis*, "nothing in the record reflects . . . (1) who made the decision to detain him, (2) when that decision occurred, (3) on what basis the decision to detain him was made, [or] (4) whether there was any material change in circumstances with respect to Mr. [Hyppolite] that triggered or merited his detention." 2025 WL 2371588, at *11. Respondents' errors, confusion, and misrepresentations regarding the statute authorizing Mr. Hyppolite's detention show how haphazard and careless they have been. With little regard to the "magnitude" of their deprivation, they have "pulled the rug out from under [Mr. Hyppolite] and many like him who tried to do things the right way." *Mata Velasquez*, 2025 WL 1953796, at *18.

Because the equitable and humanitarian considerations in Mr. Hyppolite's case weigh in his favor, this Court should order his immediate release.

## CONCLUSION

27

For the foregoing reasons, Mr. Hyppolite respectfully requests the Court to order his immediate release from custody and enjoin Respondents from re-detaining him during the pendency of his immigration proceedings without a pre-deprivation hearing before this Court, and from transferring him away from the jurisdiction of this Court.

Dated: September 25, 2025           Respectfully submitted,
      Washington, D.C.

*/s/ Cassandra Charles*
Cassandra Charles
Bar No: 5540133
National Immigration Law Center
P.O. Box 34573
Washington, D.C. 20043
Telephone: 213-639-3900
Fax: 213-639-3911
Email: charles@nilc.org

Kevin Siegel
Bar No: 5800511
National Immigration Law Center
P.O. Box 34573
Washington, D.C. 20043
Telephone: 410-530-6466
Email: siegel@nilc.org

Marlene Nathalie Berroa Rodriguez
Bar No: 6208508
National Immigration Law Center
P.O. Box 34573
Washington, D.C. 20043
Telephone: 202-384-1276
Email: berroa@nilc.org

*Attorneys for Petitioner*

## CERTIFICATE OF SERVICE

I hereby certify that on September 25, 2025, I electronically filed the foregoing with the Clerk of the Court for the United States District Court for Eastern District of New York by using the CM/ECF system. I certify that all participants in the case are registered CM/ECF users and that service will be accomplished by the CM/ECF system.

<u>*/s/ Cassandra Charles*</u>
Cassandra Charles
*Attorney for Petitioner*