UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
-------------------------------------------------------------X

Jhon Peter Hyppolite,

                      Petitioner,

            -against-

Kristi Noem, *in her official capacity*
*as Secretary of the U.S. Department*
*of Homeland Security*, Pam Bondi, *in her*
*official capacity as Attorney General*,
Donald J. Trump, *in his official capacity*
*as President of the United States*,
U.S. Department of Homeland Security,
Todd Lyons, *Acting Director of the U.S.*
*Immigration & Customs Enforcement, in his*
*official capacity*, U.S. Immigration & Customs
Enforcement, Marco Rubio, *Secretary of State,*
*in his official capacity*, U.S. Department of State,
Russel Hott, *Acting Director of New York Field*
*Office for U.S. Immigration & Customs*
*Enforcement, in his official capacity*,
Sirce E. Owen, *Acting Director of the Executive*
*Office for Immigration Review, in her official*
*capacity*, and Raul Maldonado, Jr., *Warden*
*of Metropolitan Detention Center, in his official*
*Capacity*,

                    Respondents.
-------------------------------------------------------------X

**MEMORANDUM & ORDER**
25-CV-4304 (NRM)

**NINA R. MORRISON**, United States District Judge:

      On December 19, 2022, nineteen-year-old Jhon Peter Hyppolite presented

himself to United States Customs and Border Patrol officials at an immigration

checkpoint at the U.S.-Mexico border, seeking asylum.  Three years earlier, at the

urging of his mother, Hyppolite fled his native Haiti out of fear for his safety.  He

1

sought refuge in Central and South America before finally making his way to the United States border, where his father is a citizen.

At the port of entry, CBP officials conducted a credible fear interview. Following the interview, Hyppolite was neither detained nor denied admission into the country. Instead, he was allowed to enter the United States without conditions, after being provided with a form I-94 and Notice to Appear at a future court proceeding.

Thus, with the permission of U.S. government officials, Hyppolite then proceeded to New York, where he lived with his U.S. citizen father for the next two-and-one-half years. During that time, Hyppolite — who had no prior criminal history — was neither arrested for nor convicted of any crime, nor was he accused of any other violation of the law. He appeared at every one of his scheduled immigration court proceedings. He pursued and obtained his GED; served as a caregiver for his elderly father, his ailing aunt, and a four-year-old cousin; and in June 2025, he obtained work authorization from the Department of Homeland Security. Hyppolite also filed three separate applications for longer-term and/or permanent legal status in the United States under established legal paths: (1) a petition for asylum under the Convention Against Torture ("CAT"); (2) an application for Temporary Protected Status ("TPS") as a citizen of Haiti; and (3) a petition seeking adjustment of status as an "alien relative" of his U.S. citizen father — all of which remain pending.

On July 8, 2025, Hyppolite attended a previously scheduled master calendar hearing at U.S. Immigration Court in New York. The hearing itself was routine, and

the Immigration Judge ("IJ") adjourned the case for a final hearing on his asylum application until February 3, 2026.

What happened next was anything but routine. Without any prior notice or explanation, as Hyppolite and his father (who had accompanied him to the hearing) left the courtroom, they found themselves surrounded and detained by agents with U.S. Immigration and Customs Enforcement ("ICE"). Although his father was released after establishing that he was a U.S. citizen, Hyppolite was not. Instead, he was placed into handcuffs and leg shackles and forcibly removed to a "holding area" at a nearby federal office building. Hyppolite remained in detention at 26 Federal Plaza for six days. He has attested (and Respondents have not disputed) that he was given "little food or water" and forced to sleep on a bare floor. Thereafter, he was transferred to the Metropolitan Detention Center ("MDC") in the Eastern District of New York, an already-overcrowded jail that houses persons accused (and in some cases, convicted) of some of the most serious and violent crimes that exist under federal law.

Hyppolite remained jailed at MDC for the next 77 days. During that time, he was denied any opportunity to appear before an IJ and seek bond — even though Respondents had provided him with a form on the first day of his detention asking whether he requested such a hearing, and he checked the box indicating that he did.

On August 8, 2025, Hyppolite filed a petition for a writ of habeas corpus with this Court, seeking an order directing Respondents, *inter alia,* to immediately release him from custody. Respondents, after being given considerable notice and an

3

extended period of time to provide their legal justification(s) for Hyppolite's original and continued detention, took the position that Hyppolite's detention for the pendency of his immigration-court removal proceedings was — and, in Respondents' view, has always been — "mandatory" under Section 235 of the Immigration and Nationality Act, codified at 8 U.S.C. § 1225.  The Court disagrees.

For the reasons set forth below, and as stated on the record at a hearing on the petition held on September 29, 2025, the Court readily finds that Hyppolite's detention is instead governed by the *discretionary* detention provisions of 8 U.S.C. § 1226(a) — which require that Respondents provide Hyppolite with notice and a bond hearing before a neutral magistrate.  And there is no dispute that Hyppolite received no such hearing before he was jailed, nor has he received one since.

As Hyppolite did not receive the process he was plainly due under the Constitution and laws of the United States before he was deprived of his liberty, he is entitled to habeas relief.   On September 29, 2025, this Court granted the writ, ordered Hyppolite's immediate release from custody, and further ordered that Respondents not re-detain him without first providing him with the notice and hearing required by 8 U.S.C. § 1226(a) and its implementing regulations.   This opinion memorializes and sets forth the grounds for the Court's ruling in greater detail.

4

## BACKGROUND

### I.    Facts

#### A.    Hyppolite's Entry into the United States

Jhon Peter Hyppolite is 22 years old.  He was born in Haiti in 2003.  *See* Declaration of Jhon Peter Hyppolite ("Hyppolite Decl.") ¶ 9, ECF No. 24-1.[1]  He has represented to this Court — and Respondents have not disputed — that he has no criminal history whatsoever, either in the United States, Haiti, or elsewhere.  *Id.* ¶ 3. Beginning in 2019, at the age of 16, Hyppolite and his family began to fear for his life if he remained in his country.  *Id.* ¶¶ 10–17.  He has provided details about the events in question in a sworn declaration, which the Court has agreed to keep under seal to protect his safety and that of his family still in Haiti.  For purposes of this opinion, however, the Court will note that the events he described are specific and personal to him, rather than generalized statements about hypothetical fears of persecution in Haiti.

In 2019, Hyppolite left his home and went into hiding with a mutual friend, *id.* ¶¶ 15–16, until he was able to safely leave Haiti for the Dominican Republic on a visa, *id.* ¶ 17.  However, Hyppolite still feared for his life in the Dominican Republic, and he fled to Brazil, where he stayed until 2022.  *See id.* ¶ 18.  He left Brazil in late 2022 and traveled to the United States, where his father is a resident and U.S. citizen, by foot and bus.  *See id.* ¶¶ 20–22.

---

[1] The Court relies on evidence submitted by the parties in outlining the relevant facts to this order.  This includes, to the extent they are uncontested, declarations submitted by both Petitioner and Respondents.

B. <u>Hyppolite's Time in the United States</u>

On December 19, 2022, Hyppolite arrived at the United States border via the Gateway International Bridge in Brownsville, Texas.  *See* Declaration of Deportation Officer Kevin Samuel ("Samuel Decl.") ¶ 4, ECF No. 14.  Hyppolite entered this port of entry with the aid of the official Customs and Border Protection ("CBP") One app. Hyppolite Decl. ¶ 22.[2]

Hyppolite immediately requested asylum, and a CBP officer conducted a credible fear interview.  Samuel Decl. ¶ 4.  His picture and fingerprints were taken, Hyppolite Decl. ¶ 23, and he was given the option of consular notification, which he declined, Samuel Decl. ¶ 4.  In his interview with the CBP officer, Hyppolite indicated that he intended to live with his father — a U.S. citizen — while in the United States. Hyppolite Decl. ¶¶ 6, 23.

At that point, CBP informed Hyppolite that he was allowed entry into the United States; he was given a Form 1-94, which was valid until December 18, 2023. Am Pet. ¶ 2; Samuel Decl ¶ 5;  Arrival/Departure Record, Ex. A to Amended Petition ("Am. Pet."), ECF No. 23-1.[3]  (All parties in this action have referred to Hyppolite's

---

[2] According to the CBP, the CBP One app allows noncitizens to submit information through a mobile application instead of waiting at a port of entry to submit that information and "streamlines the experience at the port of entry."  U.S. Customs and Border Protection, *Fact Sheet: Using CBP One to Schedule an Appointment*, U.S. Customs and Border Protection, https://www.cbp.gov/sites/default/files/assets/documents/2023-Jan/CBP%20One%20Fact%20Sheet_English_3.pdf (last visited Oct. 6, 2025).

[3] According to the CBP, and I-94 will be issued "during the admission process at the port of entry," and is "needed by all visitors except: U.S. Citizens, returning

entry into the United States as including some form of "parole" conferred by DHS in December 2022, although they differ on the precise meaning of that term and its application to Hyppolite.)[4]  He was also served with a Notice to Appear ("NTA") informing him that he was removable pursuant to the Immigration and Nationality Act ("INA"), § 212(a)(7)(A)(i)(I), and ordering him to appear at the New York Immigration Court at 26 Federal Plaza on February 15, 2023.  Samuel Decl. ¶ 5; 7/8/2022 NTA, Documents Filed Under Seal Pursuant to the Court's September 16, 2025 Order ("Sealed Docs.") at 34, ECF No. 20.[5]

On January 15, 2023, Hyppolite received an updated NTA at his home address in New York, requiring him to appear in front of a Judge of the United States Immigration Court ("IJ") at 201 Varick Street in Manhattan on March 19, 2024. 1/15/2023 NTA, Ex. B. to Am. Pet., ECF No. 23-2.  That NTA charged him with removability pursuant to INA § 212(a)(7)(A)(i)(I).  *Id.* at 4.

---

resident aliens, aliens with immigration visas, and most Canadian citizens visiting or in transit."  *Official Site for Travelers Visiting the United States*, Department of Homeland Security, https://i94.cbp.dhs.gov/home (last visited Oct. 6, 2025).

[4] At oral argument, the Court probed the parties' understanding of the term "parole" in the immigration context, including what legal status it may have conferred on Hyppolite at the time he was allowed to enter the country in December 2022 and what implications it may have for Respondents' authority to detain him at this time.  *See* Oral Argument ("OA") Tr. at 9–14, 18–22.  Ultimately, Respondents took the position that whether and for how long Hyppolite was paroled into the U.S. was "not material" to the Court's resolution of the issues presented in Hyppolite's habeas petition, *id.* at 10, and on the present record, the Court agrees.

[5] Unless otherwise noted, pincites shall refer to the pages generated by CM/ECF, not the internal pagination of a document.

Hyppolite appeared at that initial hearing before an IJ, and the IJ rescheduled the hearing multiple times. Samuel Decl. ¶ 8. Hyppolite attests, and Respondents do not contest, that he has duly appeared at every immigration court proceeding on his application to remain in the United States since he arrived in 2022. Hyppolite Decl. ¶ 23.

While in the United States, Hyppolite has actively pursued multiple paths to legal status. In November 2024, he filed a Form I-589 — seeking asylum, withholding of removal, and protection under the Convention Against Torture ("Asylum Application"). Samuel Decl. ¶ 9; Hyppolite Decl. ¶ 26. He filed this form without the assistance of an attorney, and it was rejected for deficiencies. Hyppolite Decl. ¶ 26. He resubmitted his application in April of 2025 — again without the assistance of an attorney — and it was again rejected. *Id.* Finally, while he was subject to the very detention by Respondents that this habeas corpus action was brought to challenge, an attorney from the Bronx Defenders assisted him in refiling his asylum application in the correct format, which has been accepted and is now under review. *Id.* ¶¶ 27–28.

In January 2025, Hyppolite also applied for Temporary Protected Status ("TPS") under the government's existing program that currently bars removal of eligible citizens of Haiti through at least February 3, 2026. *See* TPS Application, Sealed Docs. at 15–28; Hyppolite Decl. ¶ 25. That application has been pending without a decision for approximately nine months. Hyppolite Decl. ¶ 25. Hyppolite's TPS application has been filed with the Court and his counsel has asserted that he is

*prima facie* eligible for TPS status, *see* Petitioner's Reply (Pet. Reply) at 30, ECF No. 24, and Respondents have neither disputed nor conceded his eligibility. Lastly, his U.S. Citizen father has filed a Form I-130 — Petition for Alien Relative — which is currently being processed. Hyppolite Decl. ¶ 30. Thus, Hyppolite currently has *three* separate pending applications through which he seeks to remain in the United States through recognized lawful channels.

Hyppolite also applied for employment authorization in May of 2025. *Id.* ¶ 29. That application was approved by DHS on June 7, 2025. *See* Form I-213, Ex. 4 to Am. Pet. at 3, ECF No. 23-4. While living with his father in the United States, Hyppolite (who had fled Haiti alone at age 16) resumed his studies and obtained his GED. Hyppolite Decl. ¶ 32.

On July 8, 2025, Hyppolite was scheduled to have a master calendar hearing in his removal proceedings. *Id.* ¶ 4; Samuel Decl. ¶ 10. According to Hyppolite, he never received notice of this hearing, but learned that he had a hearing scheduled for that date when he had checked the EOIR Automated Case Information System for updates on his application(s) to remain a few days prior to July 8. Hyppolite Decl. ¶ 31. He appeared at the hearing on July 8 accompanied by his father, but without legal representation. *Id.* ¶¶ 4, 6; Samuel Decl. ¶ 10.

At the hearing, the IJ adjourned Hyppolite's case to February 3, 2026. Hyppolite Decl. ¶ 4. As he stepped out of the courtroom, however, he and his father were arrested by officers from the Department of Homeland Security ("DHS"). *Id.* ¶¶ 4, 6; Samuel Decl. ¶ 11. Hyppolite's father was released when it was confirmed

9

that he was a United States citizen.  Hyppolite Decl. ¶ 6.  Hyppolite, however, was handcuffed and shackled around his ankles, and was taken to 26 Federal Plaza.  *Id.* ¶ 5.[6]

C.  Hyppolite's Detention

After being placed under arrest, Hyppolite was provided with a Form I-286, Notice of Custody Determination.  *See* Samuel Decl. ¶ 11.  The Notice itself states that Hyppolite was to be detained by DHS "[p]ursuant to the authority contained in section 236 of the Immigration and Nationality Act and part 236 of title 8, Code of Federal Regulations."  I-286, Ex. B. to Samuel Decl., ECF No. 14-1.  Section 236 of the INA is codified at 8 U.S.C. § 1226.  *See* Credits, 8 U.S.C. § 1226.

Additionally, on the I-286 form, Hyppolite was given the option to check a box requesting that an IJ review the custody determination; he checked that box, informing DHS that he did wish to have that judicial review.  *See* I-286.  Hyppolite was also provided with a Form I-200, Warrant for Arrest of Alien.  *See* Samuel Decl. ¶ 11.  The warrant — addressed to immigration officers — authorized the service of the warrant "pursuant to section 236 and 287 of the Immigration and Nationality Act."  I-200, Ex. A to Samuel Decl., ECF No. 14-1.

---

[6] The day of Hyppolite's arrest — July 8, 2025 — is also the day that the Acting Director of ICE, Todd Lyons, released an internal memorandum indicating that the agency had "revisited its legal position on detention and release authorities" and concluded that noncitizens who were living in the United States but had entered the country illegally were to be detained "for the duration of their removal proceedings."  *See* Maria Sacchetti, Carol D. Leonnig, *ICE Declares Millions of Undocumented Immigrants Ineligible for Bond Hearings*, The Washington Post, July 14, 2025, https://www.washingtonpost.com/immigration/2025/07/14/ice-trump-undocumented-immigrants-bond-hearings/.

According to CBP Officer Samuel, Hyppolite was offered the Incentivized Voluntary Departure Program, which provides noncitizens assistance with travel logistics and a $1,000 stipend if they agree to voluntarily leave the United States. Samuel Decl. ¶ 12. Hyppolite declined. *Id.*

Hyppolite was held in a "Hold Room" in the immigration offices at 26 Federal Plaza until July 14, 2025, six days following his arrest. *Id.* ¶ 13. While in the Hold Room, according to Hyppolite, he was provided with very little food or water, limited access to bathroom facilities or a shower, and had to sleep on the floor with no linens. Hyppolite Decl. ¶ 7.

On July 14, 2025, Hyppolite was transferred to the Metropolitan Detention Center ("MDC") in Brooklyn, New York. Samuel Decl. ¶ 13. Hyppolite attests that his conditions at MDC were "not much better" than they were at 26 Federal Plaza. Hyppolite Decl. ¶ 7. While in custody, Hyppolite obtained an attorney for his immigration proceedings from a legal services organization, the Bronx Defenders. Samuel Decl. ¶ 15. He was continuously held at MDC from July 14 until his habeas hearing before this Court on September 29, 2025, without ever being afforded the bond hearing before an IJ that he had requested on the day of his arrest. Hyppolite Decl. ¶ 7.

## II.    Procedural History

On August 4, 2025, Hyppolite filed a petition for a writ of habeas corpus in the Eastern District of New York *pro se* through his next-of-friend and father Pierre

Hyppolite Grand, naming LaDeon Francis and Kristi Noem as Respondents.[7] Petition, ECF No. 1. On August 8, 2025, the case was assigned to the undersigned. The Court immediately enjoined Hyppolite's removal from the United States or his transfer from the Eastern District of New York, the Southern District of New York, or the District of New Jersey. *See* Scheduling Order at 1–2, ECF No. 4. Additionally, this Court ordered Respondents to show cause by September 8, 2025 as to why the petition should not be granted, and for Hyppolite to submit a reply — if any — by September 15, 2025. *Id.* at 3. The Court also scheduled a hearing for September 18, 2025. *Id.* at 4.

However, on September 8, 2025, no response had been filed by Respondents. Thus, on September 9, 2025, this Court again ordered Respondents to reply to Hyppolite's petition. ECF No. 6. On September 11, 2025, counsel for Respondents informed the Court that they had inadvertently overlooked the Court's prior scheduling order and requested an extension to the time to file their response to the petition. ECF No. 7; No. 9. This Court granted that motion in part, extending Respondents deadline to respond to September 15, 2025. *See* 9/11/2025 Docket Order. By that time, Hyppolite had been jailed at MDC for approximately two months.

On September 15, Respondents filed their opposition to Hyppolite's petition for a writ of habeas corpus, *see* Resp. Br., ECF No. 13, as well as a declaration from Deportation Officer Kevin Samuel — which was accompanied by four exhibits, *see*

---

[7] Since his initial *pro se* filing, more respondents have been added to the action and the caption reflects as much.

ECF No. 14.  The next day, counsel from the National Immigration Law Center filed notices of appearance for Hyppolite.  *See* ECF Nos. 12, 15, and 16.  Given their recent entry into the case, Hyppolite's new counsel requested that the September 18 hearing be converted to a status conference, ECF No. 19, and this Court granted that request, *see* 9/16/2025 Docket Order.  The Court also instructed Respondents to provide the Court with certain documents (under seal) that were referenced in but not attached to their opposition.  *Id.*

On September 18, 2025, this Court held a status conference with all the parties present.  *See* 9/18/2025 Minute Entry.  At that conference, the Court granted Hyppolite's request to file an amended petition for a writ of habeas corpus, as well as leave to reply to Respondents' opposition to Hyppolite's original petition.  *See id.*  The Court scheduled a hearing on the petition for September 29, 2025.  *Id.*  On September 26, 2025, after receiving the Amended Petition, *see* ECF No. 23, and reply briefing, *see* ECF No. 24, from Hyppolite, the Court held a short video conference with all parties, in which it granted Respondents leave to file a sur-reply — if they chose to do so — by 6:00pm on September 27, 2025.  *See* 9/27/2025 Minute Entry.  The Respondents did not file a sur-reply.

On September 29, 2025, this Court held a hearing and oral argument on Hyppolite's Amended Petition for a writ of habeas corpus.  *See* 9/29/2025 Minute Entry.  At the conclusion for argument, the Court orally granted Hyppolite's petition and ordered his immediate release.  This opinion follows to memorialize and provide a more fulsome explanation of the Court's reasoning.

## **DISCUSSION**

Hyppolite seeks a writ of habeas corpus and an order releasing him from custody under 28 U.S.C. § 2241, arguing that his detention at MDC violates the Constitution and laws of the United States.[8] Am. Pet. ¶¶ 65–86.  He offers four core legal arguments in support of his petition.  First, he alleges that his detention violates his substantive due process rights guaranteed by the Fifth Amendment to the U.S. Constitution.  *Id.* ¶¶ 65–72.  Second, he alleges that his detention violates his procedural due process rights under the Fifth Amendment to the U.S. Constitution. Am. Pet. ¶¶ 73–77.  Third, he alleges that he is being detained pursuant to an unlawful application of the INA, 8 U.S.C. § 1225(b).  *Id.* ¶¶ 78–81.  Finally, he alleges that Respondents' detention of him while his removal proceedings are pending constitutes an arbitrary and capricious agency action in violation of the Administrative Procedures Act.  *Id.* ¶¶ 82–86.

In his prayer for relief, in addition to ordering his immediate release from custody, Hyppolite asks this Court to enjoin Respondents from transferring him out of this jurisdiction pending the adjudication of his removal proceedings, and further order that Respondents not re-detain him during the pendency of his removal proceedings without leave of this Court.  *Id.* at 23.

---

[8] Hyppolite was released from detention on September 29, 2025, shortly after the Court granted his petition at the conclusion of his habeas hearing.  However, because this Order serves to memorialize the Court's oral ruling on the day it granted the petition and ordered him released, the Order refers to his detention in the present tense as it existed at the time of the ruling.

For the reasons to follow, this Court agrees that Hyppolite's detention violates his clearly established Fifth Amendment right to procedural due process and is therefore unconstitutional.  Because the Court grants his writ of habeas corpus on grounds of procedural due process, it declines to address his other claims.

Hyppolite's procedural due process claim requires the Court to answer two separate questions:

(1) whether Hyppolite, a noncitizen who has resided continuously in the United States since December of 2022, is detained pursuant to 8 U.S.C. § 1225(b)(2)(A) ("§ 1225(b)(2)(A)"), which requires the mandatory detention of a noncitizen who is an "applicant for admission" and is "seeking admission" to the country, or if he is being detained pursuant to 8 U.S.C. § 1226(a) ("§ 1226(a)"), which provides for the discretionary authority to detain noncitizens who are "already in the country," *Jennings v. Rodriguez*, 583 U.S. 281, 288–89 (2018); and

(2) whether, if Hyppolite is being detained pursuant to § 1226(a), the fact that Respondents placed him in detention without any individualized consideration of his circumstances or a pre-deprivation hearing before an IJ violates his right to procedural due process.

Insofar as this Court and the parties are aware, to date, every single Article III court that has examined how the relevant provisions of the INA apply to persons such as Hyppolite has reached the exact same answer to the first question — uniformly finding that their detention is subject to the *discretionary* provisions of

15

§ 1226(a), not the "mandatory" provisions of § 1225(b) as Respondents claim.  This Court agrees.

As for the second question, § 1226(a) and its implementing regulations clearly circumscribe the conditions under which Hyppolite may (and may not) be detained while in removal proceedings.  When Respondents placed him under arrest without notice and an opportunity to be heard on July 8, 2025, and then imprisoned him in a federal jail for over twelve weeks without a pre-deprivation bond hearing, they violated his established right to procedural due process.

## I.    Hyppolite is Detained Pursuant to 8 U.S.C. § 1226(a)

As the parties recognize, a critical threshold question the Court must answer is whether Hyppolite was taken into custody on July 8 and was thereafter held in detention pursuant to § 1225(b)(2)(A) or § 1226(a).  *See* Resp. Br. 14–19; Pet. Reply 15–19.  Respondents do not dispute that Hyppolite did not receive a pre-deprivation bond hearing, and that they made no individualized determination that Hyppolite posed either a risk of non-appearance or a danger to the community before he was jailed.  Since the two statutes have notably different mandates as to whether a noncitizen must be provided with any individualized determination prior to being taken into custody, the question of which provision Hyppolite falls under is central to the resolution of his petition.

Respondents argue that Hyppolite is detained pursuant to § 1225(b)(2)(A), *see* Resp Br. 14–19, which states, in relevant part, that "in the case of an alien who is an *applicant for admission*, if the examining immigration officer determines that an

alien *seeking admission* is not clearly and beyond a doubt entitled to be admitted, the alien *shall be detained* for a proceeding under section 1229a of this title," 8 U.S.C. § 1225(b)(2)(A) (emphasis supplied).  Thus, § 1225(b)(2)(A) provides for *mandatory* detention of a noncitizen who falls under its ambit.

Hyppolite argues that he is being detained pursuant to § 1226(a), *see* Pet. Reply 15–19, which states in relevant part that "[o]n a warrant issued by the Attorney General, an alien *may be arrested and detained* pending a decision on whether the alien is to be removed from the United States."  8 U.S.C. § 1226(a) (emphasis supplied).  Thus, § 1226(a) is a *discretionary* detention provision.  The implementing regulations of § 1226(a) indicate that the factors which must be considered upon detention of a noncitizen covered by the statute are whether the noncitizen is a "danger to property or persons" and whether he is "likely to appear for any future proceeding."  8 C.F.R. § 1236.1(c)(8); 8 C.F.R. § 236.1(c)(8).  If DHS determines that the noncitizen is subject to detention, he may still apply for that determination to be reviewed by an IJ.  8 C.F.R. §§ 1003.19(d), (e).  Thus, the discretionary authority in § 1226(a) requires an individualized bond determination before a noncitizen may be taken into custody.  *See Velesaca v. Decker*, 458 F. Supp. 3d 224, 241 (S.D.N.Y. 2020) (noting that the government "do[es] not dispute that 8 U.S.C. § 1226(a) and its implementing regulations require ICE officials to make an individualized custody determination").

For the following reasons, the Court agrees with Hyppolite that he is detained under § 1226(a).

A.  <u>Respondents' Contemporaneous Classification of Hyppolite's Detention Under § 1226(a)</u>

As an initial matter, Respondents own documentation provided to Hyppolite on the date of his arrest expressly stated that his detention was authorized under the authority Congress provided to DHS under § 1226(a), *not* § 1225(b)(2)(A).

For example, Form I-200, which is the arrest warrant authorizing Hyppolite's detention, was directed to immigration officers "authorized pursuant to sections 236 and 287 of the Immigration and Nationality Act . . . to serve warrants of arrest for immigration violations." Form I-200.  Crucially, the statutory codification of INA 236 is 8 U.S.C. § 1226.  *See* Credits, 8 U.S.C. § 1226.  Thus, the very arrest warrant provided to Hyppolite by Respondents on July 8, 2025 — the day of his detention — indicated that he was being detained under the *discretionary* detention provision of § 1226.

Similarly, and also on the day of his arrest, he was provided with a Notice of Custody Determination, which informed him that he was detained "[p]ursuant to the authority contained in section 236 of the Immigration and Nationality Act and part 236 of title 8, Code of Federal Regulations."  *See* I-286.  This form also provided Hyppolite with the option of checking a box to indicate that he "request[ed] an immigration judge review . . . this custody determination."  *Id.*  As detention under § 1225(b)(2)(A) is mandatory, there is no right to a review by an IJ.  Thus, in at least two separate ways, the Notice of Custody Determination informed Hyppolite that his detention was *discretionary*, rather than mandatory.

18

The Court recognizes that Respondents' own initial classification of Hyppolite's detention is not dispositive or controlling here. If Respondents had initially incorrectly classified the detention as mandatory under § 1225(b)(2)(A), and provided Hyppolite with documentation indicating as much, their mistake would not be binding on the Court. However, while the Court agrees with Respondents that this history is "not controlling," *see* Oral Argument ("OA") Tr. at 7, it certainly is relevant to the Court's assessment of the credibility and good faith of "Respondents' new position as to the basis for [Hyppolite's] detention, which was adopted post hoc and raised for the first time in this litigation." *Lopez Benitez v. Francis*, No. 25-cv-5937 (DEH), 2025 WL 2371588, at *5 (S.D.N.Y. Aug. 13, 2025) (citing *Dep't of Homeland Sec. v. Regents of the Univ. of Cal.*, 591 U.S. 1, 22, 24 (2020) (declaring, in the context of administrative law, that "[t]he basic rule here is clear: An agency must defend its actions based on the reasons it gave when it acted")). However, irrespective of Respondents' classification of Hyppolite's detention prior to this litigation, for the reasons to follow, the Court finds that he is clearly not subject to § 1225(b)(2)(A).

B. Hyppolite Is Not Subject to Mandatory Detention Under § 1225(b)(2)(A)

Respondents argue that, regardless of their earlier declaration that Hyppolite was subject to detention under § 1226(a), he still "falls squarely within the ambit of INA's mandatory detention requirement, 8 U.S.C. § 1225(b)(2)(A)." Resp. Br. at 14. The Court disagrees.

Section 1225(b)(2)(A) states that, "in the case of an alien who is an *applicant for admission*, if the examining immigration officer determines that an alien *seeking*

*admission* is not clearly and beyond a doubt entitled to be admitted, the alien *shall be detained* for a proceeding under section 1229a of this title."  8 U.S.C. § 1225(b)(2)(A) (emphasis supplied).  Respondents argue that Hyppolite is an "applicant for admission" within the meaning of § 1225 and is therefore subject to its mandatory detention provision.  Resp. Br. at 14 (*citing DHS v. Thuraissigiam*, 591 U.S. 103, 109 (2020) ("[A]n alien present in the United States who has not been admitted . . . is deemed 'an applicant for admission.'"  (quoting 8 U.S.C. § 1225(a)(1)))).  It is quite clear, however, that the mandatory detention provision of § 1225 (b)(2)(A) does not apply to someone like Hyppolite — who was duly interviewed by CBP at the border and allowed to enter the country nearly three years ago, and who has followed all laws and procedures that accompanied his continued presence within the United States ever since that time.

The Court starts with the statutory text.  Respondents' position violates the canon of statutory interpretation that "every clause and word of a statute should have meaning." *United States, ex rel. Polansky v. Exec. Health Res., Inc.*, 599 U.S. 419, 432 (2023) (internal quotation marks omitted).  This is because if the mandatory detention provision in § 1225(b)(2) applied to *all* noncitizens who are "applicants for admission," then there would be no need for Congress to have separately referenced a sub-category of persons "seeking admission" in the specific section that relates to mandatory detention.  Adopting Respondents' position would thus require the Court to "elide[] or avoid[] section 1225(b)(2)(A)'s 'seeking admission' language . . . , treating it as mere surplusage of the 'applicant' requirement." *Martinez v. Hyde*, No. 25-cv-

20

11613 (BEM), 2025 WL 2084238, at *4 (D. Mass. July 24, 2025); *see also Rosado v. Figueroa*, No. CV 25-02157 PHX DLR (CDB), 2025 WL 2337099 (D. Ariz. Aug. 11, 2025), at *11 ("Respondents' selective reading of the statute — which ignores its 'seeking admission' language — violates the rule against surplusage and negates the plain meaning of the text"), *report and recommendation adopted sub nom. Rocha Rosado v. Figueroa*, No. CV-25-02157 PHX DLR (CDB), 2025 WL 2349133 (D. Ariz. Aug. 13, 2025); *Lopez Benitez,* 2025 WL 2371588, at *6 (same).

And it is not just subsection § 1225(b)(2)(A) that undermines Respondents' position.  In interpreting the language of a statute, courts "must read the words in their context and with a view to their place in the overall statutory scheme." *King v. Burwell*, 576 U.S. 473, 486 (2015) (internal quotation marks omitted).  The duty of a court is to "construe statutes, not isolated provisions." *Graham Cnty. Soil & Water Conservation Dist. v. U.S. ex rel. Wilson*, 559 U.S. 280, 290 (2010) (internal quotation marks omitted).  In considering § 1225(b)(2)(A) within its statutory context, it was clearly intended to apply to noncitizens who are *presently* seeking to enter the United States, and not those, like Hyppolite, who have lived in the country for almost three years.  Notably, Section 1225(b)(2)(A) is "[s]ubject to subparagraphs (B) and (C)," which provide, *inter alia*, that subparagraph A does not apply to "crewm[e]n" or to a "stowaway," 8 U.S.C. § 1225(b)(2)(B), and that "[i]n the case of an alien described in subparagraph (A) who is *arriving* on land (whether or not at a designated port of arrival) from a foreign territory contiguous to the United States, the Attorney General may return the alien to that territory pending a proceeding under section 1229a of

21

this title."   8 U.S.C. § 1225(b)(2)(C).   This makes it clear that the category of applicants for admission covered by § 1225(b)(2) who are "seeking admission" is meant to refer to those who are presenting themselves at the border, or who were recently apprehended just after entering — not those in Hyppolite's circumstances.

Respondents' position also cannot be reconciled with a recent amendment to the INA that expanded the categories of persons subject to mandatory detention pursuant to 8 U.S.C. § 1226(c).  Section 1226(c) provides for mandatory detention for certain noncitizens who meet very specific criteria.  In January of 2025, Congress amended §1226(c) to add additional categories of noncitizens already living within the United States who are subject to mandatory detention: those who meet certain inadmissibility criteria *and* certain additional criminal criteria — including those who have been charged, arrested for, or convicted of theft, burglary, larceny, and shoplifting.  *See* 8 U.S.C. § 1226(c).  Those recent amendments are known as the Laken Riley Act, Pub. L. No. 119-1, 139 Stat. 3 (2025).

"When Congress acts to amend a statute, we presume it intends its amendment to have real and substantial effect."  *Stone v. I.N.S.*, 514 U.S. 386, 397 (1995).  As a federal district court in Michigan recently noted, "[i]f § 1225(b)(2) already mandated detention of any alien who has not been admitted, regardless of how long they have been here, then adding § 1226(c)(1)(E) to the statutory scheme was pointless."  *Lopez-Campos v. Raycraft*, No. 25-cv-12486 (BRM), 2025 WL 2496379, at *8 (E.D. Mich. Aug. 29, 2025).  This Court agrees.  If § 1225(b)(2)(A) applied to all "applicants for admission," including but not limited to those who had previously entered the United

States and were later accused or convicted of committing certain crimes, there would have been no need for Congress to amend the INA as recently as January of this year to add *additional* categories of persons subject to § 1226(c)'s mandatory detention provision. Under Respondents' reading of the INA, all noncitizens already in the United States who are in the process of seeking legal avenues to remain here are "seeking admission," and thus subject to mandatory detention — whether or not they were accused or found guilty of a single criminal offense listed in the Laken Riley Act. As the Supreme Court has explained, "the canon against surplusage is strongest when an interpretation would render superfluous another part of the same statutory scheme." *Marx v. Gen. Revenue Corp.*, 568 U.S. 371, 386 (2013).

Unable to square their position with the plain language of § 1225(b)(2)(A) and § 1226(a), Respondents next argue that it is justified by the Supreme Court's decisions in *Jennings v. Rodriguez*, 583 U.S. 281 (2018), and *DHS v. Thuraissigiam*, 591 U.S. 103 (2020). Respondents are incorrect. In *Jennings*, the Supreme Court considered an entirely different question than the one presented here: whether noncitizens *who were indisputably subject to the mandatory detention provisions* of 8 U.S.C. §§ 1225(b)(1), 1225(b)(2), or 1226(c), were entitled to "periodic bond hearings," *Jennings*, 583 U.S. at 286, and whether the detention for noncitizens held under U.S.C. §§ 1225(b)(1) and (b)(2) is limited to a six-month period, *id.* at 297. In holding that the mandatory-detention provisions of the INA contained no such requirements, *Jennings* said nothing about whether persons like Hyppolite were subject to those

provisions in the first place.[9]  Thus, *Jennings* clearly does not control, and ultimately

provides little guidance on, the very different question at hand — whether Hyppolite

is among those noncitizens who are subject to mandatory detention under

§ 1225(b)(2)(A) at all, after having been present in the country for almost three years.

And Respondents' reliance on *Thuraissigiam* is similarly misplaced.  As one court in

the Northern District of California recently explained:

> In *Thuraissigiam*, the petitioner had "succeeded in making it 25 yards
> into U. S. territory" when he was detained under the expedited removal
> statute.  *Id.* at 139.  After an asylum officer and immigration judge
> determined that he lacked a "credible fear" and was thus eligible for
> immediate removal, the petitioner sought "a new opportunity to apply
> for asylum and other applicable forms of relief."  *Id.* at 115.  Notably,
> "[h]is petition made no mention of release from custody."  *Id.*  In denying
> his petition, the Supreme Court relied on the "sovereign prerogative" to
> "admit or exclude" aliens, which it held applied even to noncitizens
> "paroled elsewhere in the country for years pending removal."  *Id.* at
> 139.  Such petitioners had "only those rights *regarding admission* that
> Congress has provided by statute."  *Id.* at 140 (emphasis added).
> *Thuraissigiam*'s holding concerns the right to additional due process
> sought over admission determinations.  It does not address the due
> process rights of a noncitizen to remain free once released.

*Salcedo Aceros v. Kaiser*, No. 25-cv-6924 (EMC), 2025 WL 2637503, at *6 (N.D. Cal.
Sep. 12, 2025).

---

[9] Respondents rely heavily on certain language taken out of context in
*Jennings*, in which the Court's opinion states that "applicants for admission fall into
one of two categories, those covered by § 1225(b)(1) and those covered by § 1225(b)(2)."
*Jennings*, 583 U.S. at 287.  This language is arguably *dicta*, and in any event, the
*Jennings* opinion elsewhere contains language that, also taken out of context strongly
supports Hyppolite's position.  *See id.* at 289 (explaining that the government's
authorization to detain noncitizens "already in the country pending the outcome of
removal proceedings" falls under § 1226).  This Court declines to speculate about
which passage from *Jennings* might better suggest the Supreme Court's resolution of
the issue before this Court, when it is clear that the *Jennings* Court neither
considered nor decided the scope of these INA subsections in the context arising here.

Respondents also point to three decisions issued by the Board of Immigration Appeals ("BIA") that they argue are consistent with their current interpretation of § 1225(b)(2)(A). As a threshold matter, these administrative agency decisions are not entitled to substantial deference. *See Loper Bright Enters. v. Raimondo*, 603 U.S. 369, 402 (2024) ("Congress has [not] taken the power to authoritatively interpret [a] statute from the courts and given it to [an] agency."). This Court has nevertheless reviewed the BIA's decisions, but finds the agency's reasoning unpersuasive.

Respondents first appeal to *Matter of Lemus-Losa*, where the BIA treated the definitions of "applicant for admission" and "seeking admission" as the same for purposes of the case on appeal before it. 25 I&N Dec. 734, 743–44 (BIA 2012). The holding of that decision, however, focused on an entirely separate issue than the one presented here: whether a noncitizen's inadmissibility under INA § 212(a)(9)(B)(i)(II) — which states that a noncitizen is inadmissible in various circumstances, including when they have accrued 1 year or more of unlawful presence in the United States after 1997, left the United States or were removed, and sought admission within ten years of leaving — preclude that noncitizen from qualifying for section 245(i) adjustment of status absent a waiver. *Id.* at 744–45.

The BIA's more recent decisions in *Matter of Yajure Hurtado*, 29 I&N Dec. 216 (BIA 2025), and *Matter of Q. Li*, 29 I&N Dec. 66 (BIA 2025), are more directly relevant. In *Hurtado*, the BIA queried whether "the INA require[s] that all applicants for admission, even those . . . who have entered without admission or inspection and have been residing in the United States for years without lawful

status" shall be "subject to mandatory detention for the duration of their immigration proceedings" under § 1225. 29 I&N Dec. at 220. There, the BIA held that the INA *does* so require. *Id.* at 229. The BIA reasoned: "[i]f [the respondent] is not admitted to the United States (as he admits) but he is not 'seeking admission' (as he contends), then what is his legal status?" *Id.* at 221. Similarly, in *Q. Li*, the BIA concluded that "for aliens arriving in and seeking admission into the United States who are placed directly in full removal proceedings, section 235(b)(2)(A) of the INA, 8 U.S.C. § 1225(b)(2)(A), mandates detention 'until removal proceedings have concluded.'" 29 I&N Dec. at 68 (quoting *Jennings*, 583 U.S. at 299). For all the reasons outlined *supra*, the Court respectfully but wholly disagrees with the reasoning of the BIA. *See, e.g.*, *Barrera v. Tindall*, No. 25-cv-541 (RGJ), 2025 WL 2690565, at *5 (W.D. Ky. Sep. 19, 2025) ("[B]ecause it is the responsibility of the court to decide whether the law means what the agency says[,] the Court disagrees with the holding of *Matter of Yajure* [*Hurtado*] and declines to follow it.") (internal quotation marks omitted)).

Indeed, in the approximately two and one-half-months since Respondents began to broadly invoke § 1225(b)(2)(A) to justify the mandatory detention of noncitizens who already reside within the United States, well over a dozen federal courts around the country have rejected Respondents' novel and illogical interpretation of the INA. *See, e.g.*, *Lopez Benitez v. Francis*, No. 25-cv-5937 (DEH), 2025 WL 2371588 (S.D.N.Y. Aug. 13, 2025); *Mata Velasquez v. Kurzdorfer*, No. 25-cv-493 (LJV), 2025 WL 1953796 (W.D.N.Y. July 16, 2025); *Lepe v. Andrews*, No. 25-cv-1163 (KES), 2025 WL 2716910 (E.D. Cal. Sep. 23, 2025); *Barrera v. Tindall*, No. 25-

26

cv-541 (RGJ), 2025 WL 2690565 (W.D. Ky. Sep. 19, 2025); *Pablo Sequen v. Kaiser*, No. 25-cv-6487 (PCP), 2025 WL 2650637 (N.D. Cal. Sep. 16, 2025); *Pizarro Reyes v. Raycraft*, No. 25-cv-12546 (RJW), 2025 WL 2609425 (E.D. Mich. Sep. 9, 2025); *Doe v. Moniz*, No. 25-cv-12094 (IT), 2025 WL 2576819 (D. Mass. Sep. 5, 2025); *Garcia v. Noem*, No. 25-cv-2180 (DMS), 2025 WL 2549431 (S.D. Cal. Sep. 3, 2025); *Lopez-Campos v. Raycraft*, No. 25-cv-12486 (BRM), 2025 WL 2496379 (E.D. Mich. Aug. 29, 2025); *Kostak v. Trump*, No. CV 25-1093 (JE), 2025 WL 2472136 (W.D. La. Aug. 27, 2025); *dos Santos v. Noem*, No. 25-cv-12052 (JEK), 2025 WL 2370988 (D. Mass. Aug. 14, 2025); *Rosado v. Figueroa*, No. CV-25-02157 PHX DLR (CDB), 2025 WL 2337099 (D. Ariz. Aug. 11, 2025), *report and recommendation adopted sub nom. Rocha Rosado v. Figueroa*, No. CV-25-02157 PHX DLR (CDB), 2025 WL 2349133 (D. Ariz. Aug. 13, 2025); *Gomes v. Hyde*, No. 25-cv-11571 (JEK), 2025 WL 1869299 (D. Mass. July 7, 2025).

At oral argument, the Court asked Respondents whether they were aware of *any* Article III court that had adopted their interpretation of § 1225(b)(2)(A) as applied to persons such as Hyppolite. *See* OA Tr. at 16–17. They were not. And this Court, too, is "aware of no federal court decision adopting [Respondents'] current, expansive interpretation of § 1225." *Giron Reyes v. Lyons*, No. 25-cv-4048 (LTS), 2025 WL 2712427, at *4 n.3 (N.D. Iowa Sep. 23, 2025).

Finally, though not necessary to its ruling, the Court concludes by noting that there is a particular illogic in Respondents' claim that Hyppolite himself is among the category of persons now subject to mandatory detention under § 1225(b)(2)(A). For

DHS was not only well aware that he had resided with his U.S. citizen father in New York for over two-and-one-half years before they arrested him; they also provided him with work authorization on June 7, 2025, just one month before he was detained.  If his detention is and has always been "mandatory" under § 1225(2)(A), as Respondents now claim, it is hard to see how the United States government would, or even could, have granted him permission to seek employment outside the confines of an ICE detention facility as recently as June 2025.

For all of these reasons, the Court now joins the broad consensus among Article III courts to date, and finds that § 1225(b)(2)(A) does *not* apply to a noncitizen like Hyppolite, who has been living in the United States for years, and that his detention can only be authorized if the procedures followed comply with 8 U.S.C. § 1226(a).

## II.    Due Process

Having determined that Hyppolite is detained pursuant to the discretionary detention authority in § 1226(a), and not the mandatory provisions of § 1225(b)(2)(A), the Court now turns to whether Hyppolite's detention satisfies the constitutional guarantees of procedural due process — specifically, as they have been held to apply to noncitizens within the United States.

In the Second Circuit, the balancing test laid out by the Supreme Court in *Mathews v. Eldridge*, 424 U.S. 319 (1976), applies when determining the "adequacy of process in the context of civil immigration confinement."  *Chipantiza-Sisalema v. Francis*, No. 25-cv-5528 (AT), 2025 WL 1927931, at *2 (S.D.N.Y. July 13, 2025).  The *Mathews* test requires courts to weigh: (1) "the private interest that will be affected

28

by the official action;" (2) "the risk of an erroneous deprivation of such interest through the procedures used, and the probable value, if any, of additional or substitute procedural safeguards;" and (3) "the Government's interest, including the function involved and the fiscal and administrative burdens that the additional or substitute procedural requirement would entail." 424 U.S. at 335. For the reasons to follow, the Court finds that all these factors warrant a finding that Hyppolite's detention is not supported by adequate process.

A.  The Private Interest Affected by the Official Action

The first *Mathews* factor — Hyppolite's private interest affected by his detention — weighs strongly in his favor. His petition invokes "the most significant liberty interest there is — the interest in being free from imprisonment." *Velasco Lopez v. Decker*, 978 F.3d 842, 851 (2d Cir. 2020). That paramount liberty interest cannot be abridged without "adequate procedural protections." *Zadvydas v. Davis*, 533 U.S. 678, 690 (2001). And as discussed *supra*, "§ 1226(a) and its implementing regulations require ICE officials to make an individualized custody determination." *Velesaca*, 458 F. Supp. at 241. Specifically, § 1226(a)'s implementing regulations require an individualized determination as to whether the detention of a noncitizen is appropriate after considering whether the noncitizen (1) is a "danger to property or persons" and (2) is "likely to appear for any future proceeding." 8 C.F.R. § 1236.1(c)(8); *see also* 8 C.F.R. § 236.1(c)(8).

It is undisputed that Hyppolite was detained without any pre-detention, individualized determination as to whether he posed a flight risk or any risk of

dangerousness.  *See* OA Tr. at 32.  Nor have Respondents disputed that if Hyppolite is properly classified under § 1226(a), he is entitled to the bond hearing set forth in the statute's implementing regulations. And there is no indication in the record, and Respondents have not otherwise alleged, that there was any material change in circumstances that triggered Hyppolite's sudden arrest and detention in July 2025. Instead, it appears Hyppolite was detained simply because, after he appeared for a previously calendared conference in immigration court, he was readily identified by Respondents as a noncitizen engaged in the process of petitioning for asylum as a legal path to remain in the United States.  But "treating attendance in immigration court as a game of detention roulette is not consistent with the constitutional guarantee of due process."  *Lopez Benitez*, 2025 WL 2371588, at *15.  Thus, Hyppolite's private interest in avoiding being detained without the individualized bond determination that § 1226(a) requires is extremely high.

B. <u>Risk of Erroneous Deprivation</u>

The next factor the Court must consider is "the risk of an erroneous deprivation of such interest through the procedures used, and the probable value, if any, of additional or substitute procedural safeguards."  *Mathews*, 424 U.S. at 335.  This factor weighs heavily towards Hyppolite as well.

The purpose of the bond hearing employed when the government seeks to exercise its discretion in detaining a noncitizen under § 1226(a) is to provide procedures which will better ensure that people who are, in fact, a risk of flight or a danger to the community are the people are ultimately detained.  The Second

Circuit's decision in *Black v. Decker*, which concerned the limited category of people who (unlike Hyppolite) *are* subject to mandatory detention under § 1226(c) is nonetheless illustrative.    103 F.4th 133 (2d Cir. 2024).[10]    The *Black* Court underscored that "the almost nonexistent procedural protections in place for section 1226(c)" contribute to a "markedly increased . . . risk of an erroneous deprivation of [p]etitioners' private liberty interests." *Id.* at 152.  It noted that the only procedural protection available to people mandatorily detained under § 1226(c) was a hearing to contest whether they in fact committed a crime that makes them subject to mandatory detention under that statute. *Id.*  In recounting the facts of the case before it, the Court noted that "it appears to us that almost *any* additional procedural safeguards at some point in the detention would add value." *Id.* at 153.  "[T]he most obvious of these," it noted, would be "an individualized bond hearing at which an [Immigration Judge] can consider the noncitizen's dangerousness and risk of flight." *Id.*

    This Court cannot and does not presume to know whether Hyppolite would have been detained had he been provided an individualized bond hearing before an IJ as § 1226(a) requires.  However, the record certainly establishes that there is, at the very least, a substantial likelihood that Respondents would have failed to meet their burden of proving that Hyppolite constituted either a flight risk or a danger to the community.  In other words, the risk that Hyppolite was erroneously deprived of

---

[10] Although the *Black* decision is from 2024, just predating the expansion of 1226(c) in the Laken Riley Act, its discussion of how the statute operates and its implications for noncitizens' liberty interests is instructive.

his liberty through Respondents' failure to provide him with a pre-detention hearing is exceedingly high.

Among other things, Hyppolite has attested, and Respondents do not dispute, that he has no criminal history — in Haiti, the United States, or elsewhere.  Hyppolite Decl. ¶ 3.  He also attested, and Respondents again do not dispute, that while he has resided in the United States for almost three years, he has attended *every* single one of his immigration court appearances.  *Id.* ¶ 23.  Additionally, he has not one, not two, but *three* separate paths through which he may be able to obtain longer-term, and perhaps permanent, residency in the United States.  First, he has applied for asylum, with his most recent, amended filing submitted with the assistance of an attorney at the Bronx Defenders.   *Id.* ¶¶ 26, 28.   Second, he has filed an application for Temporary Protected Status, and the record gives no indication that he is not *prima facie* eligible for that status.  *Id.* ¶ 25.  Should Hyppolite be granted TPS status in the coming weeks or months, Respondents would be legally barred from removing him from the United States until at least February 3, 2026.  *See Haitian Evangelical Clergy Ass'n v. Trump*, No. 25-cv-1464 (BMC), 2025 WL 1808743, at *8–9 (E.D.N.Y. July 1, 2025).  And third, his United States citizen father has filed a petition to adjust Hyppolite's legal status by reason of his family ties under 8 U.S.C. § 1255.  Am. Pet. ¶ 50.

Were that not enough, Hyppolite has attested that he holds significant responsibilities as a caregiver for his elderly United States citizen father and his aunt, who recently suffered a stroke.  Hyppolite Decl. ¶ 32.  He also has obtained his

GED while in the United States, helps his cousin care for her 4-year-old daughter, *id.*, and, as discussed *supra*, recently obtained work authorization. Thus, the risk of erroneous deprivation of liberty if Hyppolite continues to be detained without a pre-deprivation bond hearing is extremely high.

### C. The Government's Interest in Detaining Hyppolite Without a Hearing

The last *Mathews* factor the Court must weigh is "the Government's interest, including the function involved and the fiscal and administrative burdens that the additional or substitute procedural requirement would entail." 424 U.S. at 335. The government's interest in detaining people on a discretionary, case-by-case basis under § 1226(a) includes "ensuring the appearance of aliens at future immigration proceedings" and "preventing danger to the community." *Valdez v. Joyce*, No. 25-cv-4627 (GBD), 2025 WL 1707737, at *4 (S.D.N.Y. June 18, 2025) (internal quotation marks omitted). As discussed *supra*, there is no indication in the record that detaining Hyppolite without a pre-deprivation hearing would further those interests, because without one, there is no basis to conclude that he falls into either category, *i.e.*, that he poses a risk of non-appearance or a danger to the community. To the contrary: his present circumstances and life history, insofar as is detailed in the array of evidence submitted by both parties, along with their pleadings, overwhelmingly supports the conclusion that he poses no such risk.

Turning to the "fiscal and administrative burdens" the Court considers in the third *Mathews* prong, the Court has no difficulty finding that the burdens of continuing Hyppolite's detention without any opportunity for him to seek bond are

33

substantially higher than the burdens of providing him with minimal additional process.  First, until recently, the government has long provided noncitizens with bond hearings before detention pursuant to § 1226(a), and there is an established process for doing so that DHS can readily follow here.  By contrast, the fiscal and administrative burdens of keeping Hyppolite — who the record suggests is not a flight risk nor a danger to the community — detained are extremely high.

In his initial *pro se* petition, Hyppolite alleged he was held in the Federal Plaza holding area for six days, where he slept "on the floor in a crowded room with other detainees" and was "only given 2 cups of water a day."  Petition ¶ 16.  In his Declaration, he further alleged that he had "little food or water" and "limited access to bathroom facilities and a shower" at Federal Plaza.  Hyppolite Decl. ¶ 7.  Upon his transfer to MDC, Hyppolite stated that the conditions were little better than those he encountered during his six days sleeping on the floor at Federal Plaza.  *Id.*  That assertion is in many respects consistent with what is already well-known to the judges of the Eastern and Southern Districts of New York about the state of affairs at MDC: that is, that the facility was already overcrowded, with the staff facing enormous challenges in attempting to provide for the safety and basic medical needs of its detainees — even before the government started keeping ICE detainees there.  *See, e.g.*, *United States v. Chavez*, 710 F. Supp. 3d 227 (S.D.N.Y. 2024) (describing the conditions at MDC as "dreadful in many respects," including it being "egregiously slow in providing necessary medical" treatment, having problems of "understaffing," and detailing an incident where inmates had been left "without toilet facilities"); *U.S.*

*v. Pickett,* No. 22-cr-486, ECF No. 55 at 6, 9 (expert report to the Court by Homer Venters, M.D. dated April 23, 2025, finding that pretrial detainee at MDC later diagnosed with bone cancer, and who had reported excruciating pain in his leg for months before he was seen by a doctor in or outside the facility, had experienced "grossly deficient delays in responding to his report of potentially serious medical problems . . . at odds with the clear standard of care in correctional health," and that MDC medical staff had repeatedly shown "inattention to his chronic and worsening pain"); Lola Fadulu, *Inmate Dies After Fight Breaks Out at Troubled Brooklyn Jail*, N.Y. Times, July 17, 2024, https://www.nytimes.com/2024/07/17/nyregion/inmate-dies-metropolitan-detention-center.html (discussing the death of an inmate before staff could intervene in a violent brawl at MDC, and noting earlier findings by a federal court regarding "horrible conditions, frequent lockdowns and staffing shortages" at the facility); Shayla Colon, *Inmates Are Charged in Killings at Federal Jail in Brooklyn*, N.Y. Times, Sept. 30, 2024, https://www.nytimes.com/2024/09/30/nyregion/inmates-charged-mdc-brooklyn-jail.html (reporting on multiple homicides at MDC and noting its "long history of staffing problems, medical mistreatment, and violence").

Thus, the third *Mathews* factor weighs strongly toward Hyppolite. There is no discernable government interest in his mandatory detention, and the fiscal and administrative burdens of giving him the process he is due — a routine bond hearing before an IJ — are minimal. By contrast, the fiscal and administrative burdens of his ongoing detention are unacceptably high.

As all three of the *Mathews* factors weigh heavily toward Hyppolite, this Court concludes that his detention violates his procedural due process rights under the Fifth Amendment, warranting a grant of his habeas petition and his immediate release.

## III.    Remedy

For the foregoing reasons, this Court grants Hyppolite's petition for a writ of habeas corpus, insofar as it seeks his immediate release from Respondents' custody. The Court further orders that Respondents not re-detain Hyppolite without providing him notice and an opportunity to be heard at a pre-deprivation bond hearing before a neutral decisionmaker, at which the government will bear the burden of showing that his detention is authorized under 8 U.S.C. § 1226(a), specifically that he poses a risk of non-appearance in court for his removal proceedings and/or that he poses a danger to the community.

In addition to the relief ordered above, Hyppolite also requests that this Court (1) require that Respondents seek leave of this Court before re-detaining Hyppolite — essentially requiring that any pre-deprivation bond hearing be conducted before this Court, or that this Court otherwise give its prior approval to Hyppolite's re-detention if Respondents again seek to remand him before his removal proceedings have concluded; and (2) enjoin Respondents from transferring him out of this jurisdiction pending the conclusion of his removal proceedings.  Am. Pet. at 23.

Regarding Hyppolite's request that any pre-deprivation hearing be conducted by this Court, as opposed to by an IJ: Hyppolite has pointed to no authority upon which the Court may order such relief, and this Court will thus deny that request

36

without prejudice to file a motion for partial reconsideration of this aspect of the Court's ruling.[11]

Finally, because this Court has ordered Hyppolite's immediate release from detention, his request to enjoin Respondents from transferring him out of the Eastern District of New York is moot. Since Respondents now cannot detain Hyppolite without first conducting a hearing before an IJ, they cannot, by definition, remove him from the District without first giving him and his counsel notice and an opportunity to be heard as to his detention. If, at some point, Respondents seek and obtain Hyppolite's detention at a duly noticed hearing before an IJ, and he believes that said detention is in violation of the Constitution or that he has some other basis for habeas relief, he may certainly seek habeas relief from this Court, and may apply for whatever emergency order may be necessary to preserve this Court's jurisdiction to adjudicate his claim(s).

---

[11] Hyppolite's counsel has identified one case in which a federal district court did enjoin Respondents from re-detaining a habeas petitioner whose status was similar to Hyppolite's without first obtaining leave of the district court. *See Mata Velasquez*, 2025 WL 1953796, at \*18. However, the *Mata-Valazquez* court did not elaborate on the basis for its authority to impose that specific condition, and petitioner's counsel has not further elaborated on how such relief might be within this Court's authority. By contrast, many district courts who have released habeas petitioners from custody after finding those petitioners' custody determinations were governed by § 1226(a) have held that the government may not re-detain them without first complying with the procedures that Respondents agree are required by § 1226(a) and its implementing regulations for persons who are properly classified under that statute, *i.e.*, a pre-deprivation bond hearing before an IJ. *See, e.g.*, *Lepe*, 2025 WL 2716910, at \*10; *Pablo Sequen*, 2025 WL 2650637, at \*10; *Aceros v. Kaiser*, No. 25-cv-6924 (EKL), 2025 WL 2453968, at \*4 (N.D. Cal. Aug. 16, 2025); *Rosado*, 2025 WL 2337099, at \*19.

## **CONCLUSION**

Hyppolite's Amended Petition for a writ of habeas corpus under 28 U.S.C. § 2241 is GRANTED. At the hearing on September 29, 2025, the Court ordered Respondents to immediately release Hyppolite from custody, and was later informed by Respondents' counsel that he was released that same day. The Court further orders that Hyppolite shall not be re-detained without notice and an opportunity to be heard at a pre-deprivation bond hearing before a neutral decisionmaker, where the government will have the burden of showing that his detention is authorized under 8 U.S.C. § 1226(a). Counsel for petitioner may file an application for attorney's fees and costs pursuant to 5 U.S.C. § 504 and 28 U.S.C. § 2412 within the time provided by the Local Rules.

SO ORDERED.


      */s/ Nina R. Morrison*
      NINA R. MORRISON
      United States District Judge


Dated: October 6, 2025
      Brooklyn, New York